Jason M. Drangel (JD 7204)
jdrangel@ipcounselors.com
Ashly E. Sands (AS 7715)
asands@ipcounselors.com
Spencer Wolgang (SW 2389)
swolgang@ipcounselors.com
Mary Kate Brennan (MB 5595)
mbrennan@ipcounselors.com
EPSTEIN DRANGEL LLP
60 East 42nd Street, Suite 2520
New York, NY 10165
Telephone:     (212) 292-5390
Facsimile:      (212) 292-5391
*Attorneys for Plaintiff*
*Ideavillage Products Corp.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IDEAVILLAGE PRODUCTS CORP., <br> *Plaintiff* <br><br> v. <br><br> AARHUS, AGRA, AINKIN2411, AIWEIKE, AWEIWEI258, BEAUTY HOMER, BEST4YOU666, BETTERLIFE2014, BHU-STORE, BINGOLEE, BLAZING MOON, BLUESISTER, BUNNYREVIEW, CAICAI SHOPING, CCMC, CHARMING_FAMILY, CHENXUCHENXU, CHUANGTENGKE（XIANGGANG）SHIYEYOUXIANGONGSI, CRAZYDEAL, INTERNATIONAL BUSINESS CO., CUTTLE FISH, D&D MALL, DADANHUANGPAI, DINGYIN96, DUNGU, EASYSHOPPINGTREE, EATWATERSEND, EVER, FASHION_STORE, FASHIONHUB, FLASAFE'S PLACE, FLYINGWING, GMAI TRADE CO., LTD., GOYO, GREEN HILL GOD, GUOYINGCHENGXIN, HOYOYOYO, HUANGWS, HUGOO, HUPAI, JACOBLI, KAIXINSHOP, KIMBERLEY, LEIOQING, LIANGHAIJUN, LINEMARTZ, LISE, LIU WU SHOP, LSEROER, LUCYGOOD, LULU MALL, LYO66881011, MAN CHART (HK) LIMITED, MJ BAGS OUTLET, MR.G, MYMEI, | **CIVIL ACTION No.** <br><br><br> **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S 1) *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER; 2) AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE; 3) ASSET RESTRAINING ORDER; 4) ORDER AUTHORIZING ALTERNATIVE SERVICE BY ELECTRONIC MEANS AND 5) ORDER AUTHORIZING EXPEDITED DISCOVERY** <br><br><br> <u>**FILED UNDER SEAL**</u> |

NGYTRADE, ONEMARK, PANDAMAN COLLECTION, PAPASTEES, PAUKTAW, PHOTOBO, PINGPONGPONG, PKA BABY, RETRO HOME FURNISHING, ROSYCLOUDS SHOP, RUNOFTHELION, SAFG, SAMLIR, SHIXINKEJI, SHOP_MORE, SMILEFULLLTD, SMT, SOCIAL SHOPPING, SOMNUS, SUPERAJ STORE, SWEETSTARS TRADING CO.,LTD, TONY Z, TOP FASHION FACTORY, VALENCE, WANELOLIFE, WDYFKLKF, WELCOMEHEREHERE, WOMEN KOREAN FAN ATTACHMENT, WONDERFUL12, WYZ, XIANGGU, XIMANCHUN, YIWU RYAN E-COMMERCE CO., LTD, YIWU WUJIANG JEWELRY CO.LTD, YIYISHANGMAOYOUXIANGONGSI, YMJJ, YUHANBAOBEI, ZAITAOWANGGOU, ZAKRA, ZHANGDABING, ZHIJIA TRADE, ZHONGLITIAN and ZMLSHOP,

*Defendants*

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF RELEVANT FACTS ............................................................ 6

    **A. PLAINTIFF'S BUSINESS AND ITS COPPER FIT PRODUCTS ................. 6**

    **B. DEFENDANTS' UNLAWFUL AND INFRINGING CONDUCT ................... 9**

        1. Plaintiff's Investigation of Defendants' User Accounts and Merchant Storefronts ................................................................. 9

III. ARGUMENT ..................................................................................................... 12

A. THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS ................. 12

        1. Defendants are Subject to Personal Jurisdiction Under N.Y. C.P.L.R. § 302(a)(1) ......................................................... 12

        2. Alternatively, Defendants are Subject to Personal Jurisdiction Under N.Y. C.P.L.R. § 302(a)(3) .............................................. 18

        3. Exercising Personal Jurisdiction Over Defendants Comports With Due Process ................................................................... 21

B. PLAINTIFF IS ENTITLED TO AN EX PARTE TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION ......................................... 22

        1. Plaintiff Will Suffer Irreparable Harm in the Absence of an Injunction Leaving it with No Adequate Remedy at Law ...................... 25

        2. Plaintiff is Likely to Prevail on the Merits of its Lanham Act Claims ............................................................................... 28

            a) The Copper Fit Marks are Strong and Distinctive ..................... 30

            b) Defendants' Counterfeit Products and Marks are Virtually Identical to the Copper Fit Products and Copper Fit Marks ........ 31

            c) Defendants' Counterfeit Products Directly Compete with the Copper Fit Products and There is No Gap to Bridge ............. 32

            d) Actual Confusion Can Be Inferred Between Defendants' Counterfeit Products and the Copper Fit Products ...................... 33

            e) Defendants Acted in Bad Faith ..................................... 33

            f) Defendants' Counterfeit Products Are of Inferior Quality .......... 34

            g) The Sophistication of Purchasers ................................. 34

        3. Plaintiff is Likely to Prevail on its Copyright Act Claims ................. 35

a)      Plaintiff owns Valid Copyrights in the Copper Fit Works ........... 35

b)      Defendants Infringed the Copper Fit Works................................ 35

4.      Plaintiff is Likely to Prevail on its State Law Claims............................. 37

5.      The Balance of Hardships Favors Plaintiff ................................................. 38

6.      Enjoining Defendants from Using the Copper Fit Marks and Copper Fit Works Will Serve the Public Interest ..................................... 39

C.   PLAINTIFF IS ENTITLED TO AN ORDER PREVENTING 1) THE FRAUDULENT TRANSFER OF ASSETS AND 2) FREEZING OF DEFENDANTS' MERCHANT STOREFRONTS........................................................... 39

1.      Defendants' Assets Must be Frozen ......................................... 39

2.      Defendants' User Accounts and Merchant Storefronts Must be Frozen ..................................................................................... 44

D.   PLAINTIFF IS ENTITLED TO AN ORDER AUTHORIZING ALTERNATIVE SERVICE OF PROCESS BY ELECTRONIC MEANS .................................... 44

E.   PLAINTIFF IS ENTITLED TO AN ORDER AUTHORIZING EXPEDITED DISCOVERY...................................................................................................... 49

F.   PLAINTIFF'S REQUEST FOR A SECURITY BOND IN THE AMOUNT OF $5,000 IS ADEQUATE ..................................................................................... 51

IV.   CONCLUSION.................................................................................................... 52

iv

## TABLE OF AUTHORITIES

**Cases**

*A + E TV Networks, LLC v. Wish Factory*, 15-cv-1189-DAB, 2016 U.S. Dist. LEXIS 33361 (S.D.N.Y. March 11, 2016).................................................................................. 20

*A. T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689 (2d Cir. 1972)........................... 31

*Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341 (Fed. Cir. 2008)..................................................... 28

*Abercrombie & Fitch Trading Co. v. Abercrombieandfitchdk.com*, No. 15-62068-CIV-BB, 2015 U.S. Dist. LEXIS 179117 (S.D. Fla. Oct. 7, 2015) ......................................... 18

*Abercrombie & Fitch Trading Co. v. Abercrombieclassic.com*, No. 15-62579-CIV-CMA, 2015 U.S. Dist. LEXIS 179041 (S.D. Fla. Dec. 11, 2015) .............................................. 18

*Adidas AG v. 007adidasuk.com*, No. 15-61275-CIV-GAYLES, 2015 U.S. Dist. LEXIS 179020 (S.D. Fla. July 13, 2015) .................................................................................... 17

*Admarketplace, Inc. v. Tee Support, Inc.*, No. 13-cv-5635-LGS, 2013 U.S. Dist. LEXIS 129749 (S.D.N.Y. Sep. 11, 2013) .................................................................................... 51

*Advanced Aerofoil Techs., AG v. Todaro*, No. 11-cv-9505-ALC/DCF, 2012 U.S. Dist. LEXIS 12383 (S.D.N.Y. Jan. 31, 2012) ........................................................................ 46

*Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd.*, No. 94-cv-5620-JFK, 1994 U.S. Dist. LEXIS 18457 (S.D.N.Y. Dec. 28, 1994). ............................................... 50

*Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2010)................................................................................................................. 17

*Allstar Marketing Group LLC v._GB Housewear Store, et al.*, No. 17-cv-7596-SHS (S.D.N.Y. Oct. 12, 2017) ...................................................................................................... 6

*Alpha Int'l, Inc. v. T-Reproductions, Inc.*, 02 Civ. 9586 (SAS), 2003 U.S. Dist. LEXIS 11224 (S.D.N.Y. July 1, 2003) ...................................................................................... 14

*AW Licensing, LLC v. Bao*, No. 15-cv-1373, 2015 U.S. Dist. LEXIS 177101 (S.D.N.Y. Apr. 1, 2015) ........................................................................................................... 6, 44, 47

*Ayyash v. Bank Al-Madina*, 233 F.R.D. 325 (S.D.N.Y. 2005) ..................................................... 50

*Balenciaga Am., Inc. v. Dollinger*, No. 10-cv-2912-LTS, 2010 U.S. Dist. LEXIS 107733 (S.D.N.Y. Oct. 8, 2010) ...................................................................................... 40

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779 (2d Cir. 1999)........... 20

*Belstaff Grp. SA v. Doe*, No. 15-cv-2242-PKC/MHD, 2015 U.S. Dist. LEXIS 178124 (S.D.N.Y. June 18, 2015)........................................................................................................ 6

*Bernard v. Commerce Drug Co.*, 774 F. Supp. 103 (E.D.N.Y. 1991)......................................... 30

*Best Van Lines, Inc. v. Walker*, 490 F.3d 239 (2d Cir. 2007) ..................................... 12, 13, 17, 21

*Best Van Lines, Inc. v. Walker*, No. 03 Civ. 6585 (GEL), 2004 U.S. Dist. LEXIS 7830 (S.D.N.Y. May 4, 2004)............................................................................................... 17

*Boisson v. Banian, Ltd.*, 273 F.3d 262, 272 (2d Cir. 2001) ........................................... 36

*Boschetto v. Hansing*, 539 F.3d 1011 (9th Cir. 2008) .................................................. 16

*Broad. Music, Inc. v. Prana Hosp.*, Inc., 158 F. Supp. 3d 184 (S.D.N.Y. 2016) ........................ 38

*Burberry Ltd. v. Euro Moda, Inc.*, No. 08-cv-5781-CM, 2009 U.S. Dist. LEXIS 53250 (S.D.N.Y. June 10, 2009)...................................................................................... 29

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (U.S. 1985)......................................... 21

*Cadbury Beverages Inc. v. Cott Corp.*, 73 F.3d 474 (2d Cir. 1996).............................. 32

*Calder v. Jones*, 465 U.S. 783 (1984)........................................................................... 21

*Cartier v. Seah LLC*, 598 F. Supp. 2d 422 (S.D.N.Y. 2009) ......................................... 17

*Chanel Inc. v. Yang*, No. C-12-04428 PJH (DMR), 2013 U.S. Dist. LEXIS 151104 (N.D. Cal. Aug. 13, 2013)................................................................................................ 10

*Chanel, Inc. v. 2012leboyhandbag.com*, No. 15-61986-CIV-WJZ, 2015 U.S. Dist. LEXIS 177989 (S.D. Fla. Oct. 13, 2015).............................................................................. 18

*Chanel, Inc. v. Chanelsstore.com*, No. 15-61156-CIV-CMA, 2015 U.S. Dist. LEXIS 179101 (S.D. Fla. Aug. 31, 2015)............................................................................. 18

*Chanel, Inc. v. Conklin Fashions, Inc.*, No. 3:15-cv-893-MAD/DEP, 2015 U.S. Dist. LEXIS 109886 (N.D.N.Y. Aug. 14, 2015) ................................................................ 6

*Chanel, Inc. v. Powell*, No. C/A 2:08-0404-PMD-BM, 2009 U.S. Dist. LEXIS 127709 (D.S.C. Mar. 31, 2009) ......................................................................................... 11

*Chloe v. Designersimports.com USA, Inc.*, No. 07-cv-1791-CS/GAY, 2009 U.S. Dist. LEXIS 42351 (S.D.N.Y. Apr. 29, 2009) ................................................................. 6

*Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549 (S.D.N.Y. 2000).................................... 13

*CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127 (E.D.N.Y. 2011) .................. 26, 39

*Datatech Enters. LLC v. FF Magnat Ltd.*, No. 12-cv-04500-CRB, 2012 U.S. Dist. LEXIS 131711 (N.D. Cal. Sept. 14, 2012) .................................................................. 41

*David Gilmour Music Ltd. v. The Partnerships and Unincorporated Associations Identified on Schedule "A"*, No. 17-cv-7763-SLE (N.D. Ill., Nov. 1, 2017) .................... 2

*DH Servs., LLC v. Positive Impact, Inc.*, No. 12 Civ. 6153 (RA), 2014 U.S. Dist. LEXIS 14753 (S.D.N.Y. Feb. 5, 2014) ....................................................................... 20

*Dig. Sin, Inc. v. Does 1-176*, 279 F.R.D. 239 (S.D.N.Y. 2012).................................... 50

*DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81 (2d Cir. N.Y. 2001) ........................................... 19

*Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975 (2d Cir. 1996) ........................................................ 52

*E.I. duPont de Nemours & Co. v. Yoshida International, Inc.*, 393 F. Supp. 502 (E.D.N.Y. 1975) .............................................................................................................. 33

*El Greco Leather Products Co. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir. 1986) ...................... 27

*Energy Brands, Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458 (S.D.N.Y. 2008) .......... passim

*EnviroCare Techs., LLC v. Simanovsky*, No. 11-CV-3458(JS)(ETB), 2012 U.S. Dist. LEXIS 78088 (E.D.N.Y. June 4, 2012) .................................................................. 15, 16

*Etna Products Co. v. Dacofa Trading Co.*, 91 Civ. 6743 (DNE), 1992 U.S. Dist. LEXIS 2924 (S.D.N.Y. Mar. 9, 1992) ............................................................................. 19

*Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168 (2d Cir. 2000)) ......................... 25

*Feist Publ'ns, Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340 (1991) ........................................ 35

*FTC v. PCCare247 Inc.*, No. 12-cv-7189-PAE, 2013 U.S. Dist. LEXIS 31969 (S.D.N.Y. Mar. 7, 2013) ..................................................................................................................... 47

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993 (2d Cir. 1997) .......................... 31

*George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532 (2d Cir. 1992) ................................. 41

*Grand v. Schwarz*, No. 15-cv-8779-KMW, 2016 U.S. Dist. LEXIS 61606 (S.D.N.Y. May 10, 2016) ................................................................................................................ 14

*GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273 (S.D.N.Y. 2002) ................................. 38

*Gucci Am. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014) .......................................................... 42

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284 (S.D.N.Y. 2003) ................... 29

*Gucci Am., Inc. v. Gucc-Outlet.com*, No. 15-62165-CIV-DPG, 2015 U.S. Dist. LEXIS 181483 (S.D. Fla. Nov. 9, 2015) ................................................................................... 18

*Gucci Am., Inc. v. Tyrrell-Miller*, 678 F. Supp. 2d 117 (S.D.N.Y. 2008) ................................... 10

*Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87 (S.D.N.Y. 2015) ........................................... 13

*Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014) ........................................................ 44

*Gucci America, Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060 (S.D.N.Y. 1991) ................ 34

*Gucci America, Inc., et al v. Alibaba Group Holding LTD, et al*, No. 1:15-cv-03784-PKC (S.D.N.Y. June 23, 2015) ........................................................................................... 6

*Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251 (1916) ......................................... 42

*HICKIES, Inc. v. Shop1668638 Store, et al.*, No. 17-cv-9101-ER (S.D.N.Y. Dec. 6, 2017) ......... 6

*Hsin Ten Enterprise USA, Inc. v. Clark Enterprises*, 138 F. Supp. 2d 449 (S.D.N.Y. 2000) ........................................................................................................................ 15

*Ideavillage Products Corp. v. Bling Boutique Store, et al.,* No. 16-cv-09039-KMW (S.D.N.Y. Nov. 21, 2016) ...................................................................................... 6

*Ideavillage Products Corp. v. chinafocus et al.,* No. 17-cv-3894-RA (S.D.N.Y. May 24, 2017) ......................................................................................................................... 6

*Ideavillage Products Corp. v. Dongguan Opete Yoga Wear Manufacturer Co., Ltd., et al.,* No. 17-cv-9099-JMF (S.D.N.Y. Nov. 27, 2017) ......................................... 6

*Illinois v. Hemi Group LLC,* 622 F.3d 754 (7th Cir. 2010) ....................................... 18

*In re Vuitton et Fils, S.A.*, 606 F.2d 1 (2d Cir. 1979)..................................................... 6

*Interlink Int'l Fin. Servs., Inc. v. Block*, 145 F. Supp. 2d 312 (S.D.N.Y. 2001)........................................................... 52

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) ................................................... 12

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66 (2d Cir. 1998) ................................................................................................................ 41

*Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*, 348 F. Supp. 2d 165 (S.D.N.Y. 2004) .................................................................................................. 38

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009)................................................. 41

*Klipsch Grp., Inc. v. Big Box Store Ltd.*, No. 1:12-cv-06283-VSB, 2012 U.S. Dist. LEXIS 153137 (S.D.N.Y. Oct. 24, 2012) ................................................................ 6

*Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123 (S.D.N.Y. 1993).............. 33

*Kwan v. Schlein*, 634 F.3d 224 (2d Cir. 2011)............................................................. 35

*Le Book Publ'g, Inc. v. Black Book Photography, Inc.*, 418 F. Supp. 2d 305 (S.D.N.Y. 2005) ....................................................................................................... 30

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982 (11th Cir. 1995)........................ 42

*Licci v. Lebanese Canadian Bank*, 732 F.3d 161 (2d Cir. 2013)................................. 12

*Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, No. 15 Civ. 8459 (LGS), 2016 U.S. Dist. LEXIS 89149 (S.D.N.Y. July 8, 2016) ........................................ 15

*Lipenga v. Kambalame*, No. 14-cv-3980-GJH, 2015 U.S. Dist. LEXIS 172778 (D. Md. Dec. 28, 2015)..................................................................................................... 47

*Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224 (2d Cir. 1992) ..................................................................................................... 25

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2d Cir. 1986)..................... 30

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532 (2d Cir. 2005) .................................................................................................. 25

*Louis Vuitton Malletier, S.A. v. 2015shoplvhandbag.com*, No. 15-62531-CIV-BLOOM, 2015 U.S. Dist. LEXIS 181477 (S.D. Fla. Dec. 18, 2015) ............................... 18

*Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339 (11th Cir. 2013) ................................... 17

*M. Shanken Commc'ns, Inc. v. Cigar500.com*, No. 07 Civ. 7371 (JGK), 2008 U.S. Dist. LEXIS 51997 (S.D.N.Y. July 7, 2008) ............................................................ 14

*Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106 (S.D.N.Y. 2010) .................................................................................................... 46

*Malcom v. Esposito*, 63 Va. Cir. 440 (Cir. Ct. 2003) ..................................................... 16

*Malibu Media, LLC v. Doe*, No. 1:16-cv-02462-AJN, 2016 U.S. Dist. LEXIS 64656 (S.D.N.Y. May 16, 2016) .......................................................................... 50

*Malibu Media, LLC v. Doe*, No. 15-cv-4369-AKH, 2015 U.S. Dist. LEXIS 87751 (S.D.N.Y. July 6, 2015) .......................................................................... 50

*Malletier v. 2015louisvuittons.com*, No. 15-61973-CIV-BB, 2015 U.S. Dist. LEXIS 181452 (S.D. Fla. Sep. 29, 2015) .......................................................... 18

*Malletier v. 2016bagsilouisvuitton.com*, No. 16-61554-CIV-DPG, 2016 U.S. Dist. LEXIS 93072 (S.D. Fla. July 18, 2016) .................................................... 10

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor,* 194 F.R.D. 618 (N.D. Ill. 2000) .................................................................................................... 50

*Microsoft Corp. v. Jun Yan,* No. 3:10-cv-00162-VLB, 2010 U.S. Dist. LEXIS 14934 (Dist. Conn. Feb. 18, 2010) ....................................................................... 42

*Milk Studios, LLC v. Samsung Elecs. Co.*, No. 14-cv-09362-PAC, 2015 U.S. Dist. LEXIS 38710 (S.D.N.Y. Mar. 25, 2015) ....................................................... 50

*Milliken v. Meyer*, 311 U.S. 457 (1940) .................................................................. 21

*Mint, Inc. v. Iddi Amad*, No. 10-cv-9395-SAS, 2011 U.S. Dist. LEXIS 49813 (S.D.N.Y. May 9, 2011) .................................................................................. 27, 38

*Mitchell Grp. USA LLC v. Udeh*, No. 14-cv-5745, 2015 U.S. Dist. LEXIS 18801 (E.D.N.Y. Feb. 17, 2015) .......................................................................... 27

*Monster Energy Co. v. Chen Wensheng*, 136 F. Supp. 3d 897 (N.D. Ill. 2015) ........................... 18

*Moose Toys Pty, Ltd. v. Thriftway Hylan Blvd. Drug Corp.*, No. 15-cv-4483 -DLI/MDG, 2015 U.S. Dist. LEXIS 105912 (E.D.N.Y. Aug. 6, 2015) ............................... 23

*Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306 (1950) ........................................... 48

*Mycoskie v. 2016tomsshoessaleoutlet.us*, No. 16-61523-CIV-GAYLES, 2016 U.S. Dist. LEXIS 95963 (S.D. Fla. July 22, 2016) ................................................... 17

*N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514 (S.D.N.Y. 2013) .............. 38

*N. Face Apparel Corp. v. Fujian Sharing Imp. & Exp. Ltd. Co.*, No. 1:10-cv-1630-AKH, 2011 U.S. Dist. LEXIS 158807 (S.D.N.Y. June 24, 2011)................................................. 6

*N.Y. State Soc'y of CPA's v. Eric Louis Assocs.*, 79 F. Supp. 4d 331 (S.D.N.Y. 1999)............... 34

*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305 (S.D.N.Y. 2010) ....... 39

*National Association for Stock Car Auto Racing, Inc. v. Does*, 584 F. Supp. 2d 824 (W.D.N.C. 2008)................................................................................................ 47

*New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194 (9th Cir. 1979)................. 29, 30

*NYP Holdings v. New York Post Pub. Inc.*, 63 F. Supp. 3d 328 (S.D.N.Y. 2014) ...................... 26

*Off-White, LLC v. ^_^ Warm House ^_^ Store, et al.*, No. 17-cv-8772-GBD, Dkt. 7 (S.D.N.Y. Nov. 29, 2017) ................................................................................... 6

*Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210 (11th Cir. 2011)................................... 17

*Ontel Products Corp. v. Auto Mall, et al.*, No. 17-cv-5190-AT (S.D.N.Y. July 18, 2017)........... 6

*Ontel Products Corporation v. Airbrushpainting Makeup Store a/k/a Airbrushespainting et al.*, No. 17-cv-871-KBF (S.D.N.Y. Feb. 6, 2017)...................................................... 6, 52

*Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014).................................................. 42

*Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*, 00-cv-5304-SJ, 2004 U.S. Dist. LEXIS 10426 (E.D.N.Y. March 26, 2004) .................................................................... 33

*Philip Morris USA Inc. v. 5 Bros. Grocery Corp.*, No. 13-cv-2451-DLI/SMG, 2014 U.S. Dist. LEXIS 112274 (E.D.N.Y. Aug. 5, 2014) .................................................... 39

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). ...................................... 29

*Polymer Technology Corp. v. Mimran*, 975 F.2d 58 (2d Cir. N.Y. 1992)..................................... 34

*Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970 (Fed. Cir. 1996) ................................................ 28

*Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, 778 F. Supp. 2d 261 (E.D.N.Y. 2011)................ 35

*Prot. One Alarm Monitoring, Inc. v. Exec. Prot. One Sec. Serv., LLC*, 553 F. Supp. 2d 201 (E.D.N.Y. 2008)................................................................................... 33

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359 (Fed. Cir. 2001)............. 28

*Rado Watch Co. v. ABC, Co.*, 92-cv-3657-PKL, 1992 U.S. Dist. LEXIS 8356 (S.D.N.Y. June 8, 1992)................................................................................................ 31

*Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552 (9th Cir. 1992) ............................... 42

*Richemont N. Am., Inc. v. Linda Lin Huang*, No. 12-cv-4443-KBF, 2013 U.S. Dist. LEXIS 136790 (S.D.N.Y. Sep. 24, 2013)........................................................ 29

*Rolex Watch, U.S.A., Inc. v. Pharel*, 09 CV 4810 (RRM) (ALC), 2011 U.S. Dist. LEXIS 32249 (E.D.N.Y. Mar. 11, 2011) ...................................................................... 17

*Rovio Entertainment Ltd. and Rovio Animation Oy v. Best Baby and Kid Store, et al.*, No. 17-cv-4884-KPF (S.D.N.Y. June 28, 2017) .......................................... 6, 52

*SEC v. Anticevic*, No. 05-cv-6991-KMW, 2009 U.S. Dist. LEXIS 11480 (S.D.N.Y. Feb. 8, 2009) ............................................................................................................... 46

*SEC v. Caledonian Bank Ltd.*, 317 F.R.D. 358 (S.D.N.Y. 2016) ................................. 43

*Seldon v. Magedson*, 11 Civ. 6218 (PAC) (MHD), 2012 U.S. Dist. LEXIS 141616 (S.D.N.Y. July 10, 2012) ........................................................................................ 13

*Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390 (1940) ................................. 42

*Skrodzki v. Marcello*, 810 F. Supp. 2d 501 (E.D.N.Y. 2011) ....................................... 17

*Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100 (2d Cir. 2006)............... 12

*Specialized Bicycle Components, Inc. v. in-style1820, et al.*, No. 16-cv-62711-CMA (S.D. Fl. Nov. 17, 2016) ................................................................................................ 2

*Spin Master Ltd. and Spin Master, Inc. v. Alan Yuan's Store, et al.*, 17-cv-7422-DLC (S.D.N.Y. Sept. 28, 2017) ...................................................................................... 6

*Spin Master Ltd. and Spin Master, Inc. v. Amy & Benton Toys and Gifts Co., Ltd., et al.*, No. 17-cv-5845-VSB (S.D.N.Y. Aug. 4, 2017) ....................................................... 6

*Star Indus. v. Bacardi & Co.*, 412 F.3d 373 (2d Cir. 2005) ......................................... 32

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97 (2d Cir. 2009) ............ 32

*Stern v. Cosby*, 246 F.R.D. 453 (S.D.N.Y. 2007) ......................................................... 50

*Stix Prods., Inc. v. United Merchants & Mfrs., Inc.*, 295 F. Supp. 479 (S.D.N.Y. 1968) ........... 30

*Sulzer Mixpac AG v. Medenstar Indus. Co.*, 312 F.R.D. 329 (S.D.N.Y. 2015) .................... 45, 46

*Tcpip Holding Co. v. Haar Communs. Inc.*, 244 F.3d 88 (2d Cir. 2001). ................... 30

*The National Football League v. Mono Lee d/b/a nflnfl.us*, No. 11-cv-8911-PKC (S.D.N.Y. Dec. 7, 2011) ............................................................................................ 47

*Thomas Publ'g Co. v. Indus. Quick Search*, 237 F. Supp. 2d 489 (S.D.N.Y. 2002) ................... 14

*Thompson Medical Co., v. Pfizer Inc.*, 753 F.2d 208 (2d Cir. 1985) ............................. 30

*Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010) ......................................... 28

*Tiffany (NJ) LLC v. Forbse*, No. 11-cv-4976-NRB, 2012 U.S. Dist. LEXIS 72148 (S.D.N.Y. May 23, 2012) ........................................................................................ 41

*Time Warner Entertainment Co., L.P. v. Does*, 876 F. Supp. 407 (E.D.N.Y. 1994) .................. 23

*Tory Burch, LLC v. Yong Sheng Int'l Trade Co., Ltd.,* No. 1:10-cv-09336-DAB, (S.D.N.Y. Jan. 4, 2011) .................................................................................................... 6

*True Religion Apparel, Inc. et al. v. Xiaokang Lee et al.,* No. 1:11-cv-08242-HB (S.D.N.Y. Nov. 15, 2011) ...................................................................................... 6

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F.Supp.2d 515 (S.D.N.Y. 2011); ........... 26

*Virgin Enterprises v. Nawab*, 335 F.3d 141 (2d Cir. 2003) ..................................................... 32, 35

*Warner Bros. Entm't Inc. v. Doe*, No. 14-cv-3492-KPF, 2014 U.S. Dist. LEXIS 190098 (S.D.N.Y. May 29, 2014) ............................................................................. 41, 42

*Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76 (2d Cir. 1981) ................................................. 33

*Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, No. 00-cv-8051-JSM, 2000 U.S. Dist. LEXIS 15664 (S.D.N.Y. Oct. 26, 2000) ............................................. 40

*WowWee Group Limited, et al. v. A249345157, et al.*, No. 17-cv-9358-VEC (S.D.N.Y. Dec. 11, 2017) ............................................................................................ 6

*WowWee Group Limited, et al. v. Aaiwa, et al.*, No. 17-cv-7969-RWS (S.D.N.Y. Oct. 17, 2017) ............................................................................................................ 6

*WPIX, Inc. v. IVI, Inc.*, 691 F.3d 275 (2d Cir. 2012) ................................................................. 26

*Yurman Design, Inc. v. PAJ Inc.,* 262 F.3d 101 (2d Cir. 2001) ................................................. 35

*Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W. D. Pa. 1997) ........... 17

**Statutes**

15 U.S.C. § 1057(b) ........................................................................................................... 28

15 U.S.C. § 1116(d)(1)(a) ............................................................................................ 22, 23

15 U.S.C. § 1117(a) ........................................................................................................... 40, 41

17 U.S.C. § 410(c) ............................................................................................................. 35

17 U.S.C. § 501(a) ............................................................................................................. 35

Fed. R. Civ. P 4 ................................................................................................................ 45, 47

Fed. R. Civ. P. 26 ............................................................................................................. 49

Fed. R. Civ. P. 4 .............................................................................................................. 46

Fed. R. Civ. P. 65 ............................................................................................ 22, 51, 52

N.Y. C.P.L.R. § 302 .............................................................................................. passim

**Other Authorities**

Senate-House Joint Explanatory Statement on trademark Counterfeiting Legislation, 130
    Cong. Rec. H12076 (Oct. 10, 1984) .................................................................................. 22

The Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents
    in Civil and Commercial Matters, November 15, 1965............................................. 45, 46

## I.   __INTRODUCTION__

Pursuant to and in accordance with the Federal Rules of Civil Procedure, Plaintiff Ideavillage Products Corp. ("Ideavillage" or "Plaintiff") submits this memorandum of law in support of its *ex parte* application for:  1) a temporary restraining order; 2) an order restraining assets and Merchant Storefronts (as defined *infra*); 3) an order to show cause why a preliminary injunction should not issue; 4) an order authorizing alternative service and 5) an order authorizing expedited discovery against above-referenced Defendants (hereinafter collectively referred to as "Defendants" or individually as "Defendant"), Third Party Service Providers (as defined *infra*) and Financial Institutions (as defined *infra*), in light of Defendants' intentional and willful offering for sale and/or sales of Counterfeit Products (as defined *infra*) ("Application").

Wish.com is a San Francisco, California-based, online marketplace and e-commerce platform owned by ContextLogic, Inc., a Delaware corporation ("ContextLogic"), that allows manufacturers and other third-party merchants, like Defendants, to advertise, distribute, offer for sale, sell and ship their retail products, which, upon information and belief, primarily originate from China,[1] directly to consumers worldwide and specifically to consumers residing in the U.S., including New York (hereinafter, "Wish"). *Declaration of Spencer Wolgang* ("*Wolgang Dec.*"), ¶ 3.  Wish has generated billions in global sales.[2]  *See id.*, ¶ 4.  Specifically, sales to the U.S. make up a significant percentage of sales made on Wish.  *See id.*, ¶ 5.  As a matter of illustration, online sales account for 8.6% of all retail transactions in the U.S. *See id.* Nearly 8% of online shopping

---

[1] *See* Armando Roggio, *Ecommerce Lessons from the Wish Shopping App*, PRACTICALECOMMERCE (Jan. 7, 2015), available at https://www.practicalecommerce.com/Ecommerce-Lessons-from-the-Wish-Shopping-App.
[2] *See* Connie Loizos, *Wish is Raising Again, and Giving Late-Stage Investors Protection*, TECHCRUNCH.COM (Oct. 28, 2016), available at https://techcrunch.com/2016/10/28/wish-is-raising-again-and-giving-late-stage-investors-protection/.

done by teenagers was performed using Wish, which is second only to Amazon.com.[3] *See id.* During Cyber Monday of 2017, purchases made on Wish accounted for 6.2% of teenager spending.[4] *See id.* Presently, Wish is valued at over $8 billion, which is more than the market value of three of the largest traditional retailers in the U.S.[5] *See id.*, ¶ 6. Between June 2014 and May 2015, nearly 100 million distinct User Accounts (as defined *infra*) were registered on Wish which currently claims a base of over 300 million users.[6] *See id.*, ¶ 7. In fact, Wish is one of the top-five largest advertisers on popular search engines and social media websites, such as Facebook and Google.[7] *See id.*, ¶ 8.

As reflected in other litigation involving third-party merchants offering for sale and selling infringing and/or counterfeit products on Wish,[8] an astronomical number of counterfeit and infringing products are sold and/or offered for sale on Wish at rampant rates.[9] *See id*., ¶ 9. Although Wish has a system in place to report intellectual property infringement, sellers of counterfeit and/or infringing products frequently re-post their listings for such products on their

---

[3] *See* Deena M. Amato-McCoy, *Study: Teens Twice as Likely to Shop Online Than Adults,* CHAINSTOREAGE.COM (Oct. 16, 2017), available at https://www.chainstoreage.com/technology/study-teens-twice-likely-shop-online-adults/.

[4] *See* Marianne Wilson, *Teens hot on Black Friday, but cool on Cyber Monday*, CHAINSTORAGE.COM (Nov. 29, 2017), available at https://www.chainstoreage.com/real-estate/teens-hot-black-friday-cool-cyber-monday/.

[5] *See* Parmy Olson, *At $8.5 Billion, Shopping App 'Wish' Is Now Worth More Than Sears, Macy's and JC Penney Combined*, FORBES, available at https://www.forbes.com/sites/parmyolson/2017/09/20/wish-8-billion-funding-amazon/#c360ab961e1d.

[6] *See* Greg Bensinger, *Wish, a Direct-From-China Shopping App, Lures Bargain Hunters*, WALL STREET JOURNAL (May 19, 2015), available at https://www.wsj.com/articles/wish-a-direct-from-china-shopping-app-lures-bargain-hunters-1431909072; WISH.COM, https://www.wish.com/careers.

[7] *See* SENSORTOWER, MOBILE ADVERTISING ATLAS, Q2 2017 REPORT, available at https://s3.amazonaws.com/sensortower-itunes/Quarterly+Reports/Sensor-Tower-Q2-2017-Ad-Intel-Data-Digest.pdf?=landing.

[8] *See, e.g.*, *Specialized Bicycle Components, Inc. v. in-style1820, et al.*, No. 16-cv-62711-CMA (S.D. Fl. Nov. 17, 2016) and *David Gilmour Music Ltd. v. The Partnerships and Unincorporated Associations Identified on Schedule "A"*, No. 17-cv-7763-SLE (N.D. Ill., Nov. 1, 2017); *see also* Andi Sykes, *Specialized Wages Ware on Counterfeiters* (Dec. 9, 2016), available at http://singletrackworld.com/2016/12/specialized-wages-war-on-counterfeiters/.

[9] *See* Tom Hoffarth, *Lakers' Wish List Cheapened by the Dozen*, DAILY NEWS (Sept. 22, 2017), available at http://www.dailynews.com/2017/09/22/hoffarth-lakers-wish-list-cheapened-by-the-dozen/.

respective Merchant Storefronts (as defined *infra*) on Wish once taken down or open new User Accounts (as defined *infra*) and/or Merchant Storefronts on Wish under different names and post similar listings for counterfeit and/or infringing products.[10]  *See id.*, ¶ 11.

Defendants are individuals and/or businesses, who, upon information and belief, are located in China but conduct business in the United States and other countries by means of their respective User Accounts and on their Merchant Storefronts on Wish, as well as any and all as yet undiscovered online marketplace platforms.  *See Declaration of Jessica Arnaiz* ("*Arnaiz Dec.*"), ¶¶ 4, 6, *Declaration of LoriAnn Lombardo* ("*Lombardo Dec.*"), ¶¶ 24-25 and *Wolgang Dec.*, ¶¶ 3, 16.  Through their Merchant Storefronts, Defendants offer for sale and/or sell consumer products, including Counterfeit Products, and target and ship such products to customers located in the U.S., including New York, and throughout the world.  *See Arnaiz Dec.*, ¶¶ 6-11, *Ex.* A; *Lombardo Dec.*, ¶ 24 and *Wolgang Dec.*, ¶ 3. Third-party merchants operating Merchant Storefronts on Wish, like Defendants, as well as other online marketplace platforms, often use evasive tactics such as aliases, false addresses and other incomplete identification information to conceal their identities and avoid detection.  *See Wolgang Dec.*, ¶ 13.  Since Wish does not require third-party merchants to display their registered business name or trade name, contact name, complete address or any other contact information, third-party merchants, like Defendants, use Wish, as well as other similarly-situated online marketplace platforms, as a way to sell infringing and/or counterfeit products with almost total anonymity.  *See id.*, ¶ 14.  In fact, Defendants' User Accounts and Merchant Storefronts are either devoid of any, or contain incomplete, information concerning Defendants' true identities,

---

[10] Wish does not generally terminate a seller's account or membership after a single or even a second or third complaint of infringement against the seller.  Pursuant to Wish.com's Terms of Service, if "the merchant conducts above restricted activities or violates this provision, the merchant should pay USD $500 as penalty per incidence." Wish.com's Terms of Service include prohibitions on a merchant being involved with the sale of "any third-party's copyright, patent, trademark, trade secret or other proprietary or intellectual property rights or rights of publicity or privacy."  *See Wolgang Dec.*, ¶ 12.

locations and contact information.  *See id.*, ¶ 24.  To further conceal their identities, sellers on Wish, as well as other online marketplace platforms, often use shipping or delivery services, such as EMS and DHL, or ePacket, which provide minimal tracking and/or contain false or incomplete return addresses.[11]  *See id.*, ¶ 15. Consequently, the true identities, locations and contact information of Defendants, as well as the locations of the Counterfeit Products that Defendants are offering for sale and/or selling, are unclear and virtually impossible for Plaintiff to obtain independently.  *See id.*, ¶ 25.

Without Plaintiff's authorization or consent, Defendants were and/or currently are manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale and/or selling products bearing and/or using the Copper Fit Marks (as defined *infra*) and/or marks that are confusingly similar to, identical to and constitute an infringement of the Copper Fit Marks and/or displaying and/or incorporating the Copper Fit Works (as defined *infra*) and/or works that are substantially similar to, identical to and constitute infringement of the Copper Fit Works (hereinafter collectively referred to as "Counterfeit Products" or "Infringing Products") to consumers located in the U.S., specifically including to consumers in New York, through their Merchant Storefronts.  *See Arnaiz Dec.*, ¶¶ 6-9, *Ex.* A; *Lombardo Dec.*, ¶¶ 24-26 and *Wolgang Dec.*, ¶¶ 18-19, 23, *Ex.* A and *Ex.* C. Defendants' aforementioned actions have caused and will continue to cause – should the requested relief be denied – irreparable harm to Plaintiff's goodwill and reputation as well as to the unassuming consumers who will continue to believe that Defendants' inferior and potentially dangerous Counterfeit Products are authorized, sponsored, approved, endorsed and/or licensed by Plaintiff, when, in fact, they are not.  *See Lombardo Dec.*,

---

[11] *See* Connie Loizos, *Wish is Raising Again, and Giving Late-Stage Investors Protection*, TECHCRUNCH.COM (Oct. 28, 2016), available at https://techcrunch.com/2016/10/28/wish-is-raising-again-and-giving-late-stage-investors-protection/.

¶¶ 26.

Plaintiff's request for *ex parte* relief is particularly necessary since Defendants are most likely located in China and conduct business entirely over the Internet. Consequently, should Defendants receive notice of the claims and allegations against them prior to the issuance of the relief sought in the instant Application, it is highly likely that they will transfer, conceal and/or destroy the inventory of the Counterfeit Products in their possession and their means of making or obtaining such Counterfeit Products, along with all business records and any and all other evidence relating to their counterfeiting activities, as well as hide or dispose of all of Defendants' Assets (as defined *infra*) to which Plaintiff may be entitled. *See Wolgang Dec.*, ¶¶ 13-15, 24. Considering that sellers on Wish and other online marketplaces, like Defendants, usually conceal their identities, such sellers often circumvent temporary restraining orders issued with prior notice by disappearing, destroying any evidence of their counterfeiting and infringing actions, and/or draining their financial accounts. *See id.* In light of the foregoing, and considering that it typically takes noticed Financial Institutions and/or Third Party Service Providers a minimum of five (5) days to locate, attach and freeze Defendants' Assets and/or Defendants' Financial Accounts (as defined *infra*), Plaintiff respectfully requests that the Court order bifurcated service. Specifically, Plaintiff asks that the Court provide enough time for the Financial Institutions and/or Third Party Service Providers to freeze Defendants' Assets, Defendants' User Accounts, Defendants' Merchant Storefronts and Financial Accounts before ordering service on Defendants.

In light of the covert nature of Defendants' offshore counterfeiting and infringing activities and the importance of creating economic disincentives for such counterfeiting and infringing activities, courts in this Circuit have recognized these concerns and often grant *ex parte*

applications for relief in similar instances of infringement on the Internet.[12]  Accordingly, Plaintiff respectfully requests that this Court grant their *ex parte* Application for the following:   1) a temporary restraining order; 2) an order restraining assets and Merchant Storefronts; 3) an order to show cause why a preliminary injunction should not issue; 4) an order authorizing alternative service and 5) an order authorizing expedited discovery against Defendants, Third Party Service Providers and Financial Institutions.

## II.     STATEMENT OF RELEVANT FACTS

### A.  PLAINTIFF'S BUSINESS AND ITS COPPER FIT PRODUCTS

Plaintiff is a leading developer, producer, marketer, and distributor of quality, innovative consumer products.  Plaintiff promotes and sells its products through national direct response

---

[12] *See, e.g., WowWee Group Limited, et al. v. A249345157, et al.*, No. 17-cv-9358-VEC, Dkt. 18 (S.D.N.Y. Dec. 11, 2017); *HICKIES, Inc. v. Shop1668638 Store, et al.*, No. 17-cv-9101-ER, Dkt. 14 (S.D.N.Y. Dec. 6, 2017); *Ideavillage Products Corp. v. Dongguan Opete Yoga Wear Manufacturer Co., Ltd., et al.*, No. 17-cv-9099-JMF, Dkt. 19 (S.D.N.Y. Nov. 27, 2017); *Off-White, LLC v. ^_^ Warm House ^_^ Store, et al.*, No. 17-cv-8772-GBD, Dkt. 7 (S.D.N.Y. Nov. 29, 2017); *WowWee Group Limited, et al. v. Aaiwa, et al.*, No. 17-cv-7969-RWS, Dkt. 21 (S.D.N.Y. Oct. 17, 2017); *Allstar Marketing Group LLC v._GB Housewear Store, et al.*, No. 17-cv-7596-SHS, Dkt. 22 (S.D.N.Y. Oct. 12, 2017); *Spin Master Ltd. and Spin Master, Inc. v. Alan Yuan's Store, et al.*, 17-cv-7422-DLC, Dkt. 19 (S.D.N.Y. Sept. 28, 2017); *Spin Master Ltd. and Spin Master, Inc. v. Amy & Benton Toys and Gifts Co., Ltd., et al.*, No. 17-cv-5845-VSB, Dkt. 17 (S.D.N.Y. Aug. 4, 2017); *Ontel Products Corp. v. Auto Mall, et al.*, No. 17-cv-5190-AT, Dkt. 6 (S.D.N.Y. July 18, 2017); *Rovio Entertainment Ltd. and Rovio Animation Oy v. Best Baby and Kid Store, et al.*, No. 17-cv-4884-KPF, Dkt. 6 (S.D.N.Y. June 28, 2017); *Ideavillage Products Corp. v. chinafocus et al.*, No. 17-cv-3894-RA, Dkt. 19 (S.D.N.Y. May 24, 2017); *Moose Toys Pty LTD et al. v. Guangzhou Junwei Trading Company d/b/a Backgroundshop et al.*, No. 17-cv-2561-LAK, Dkt. 12 (S.D.N.Y. May 11, 2017); *Rovio Entertainment Ltd. and Rovio Animation OY v. Angel Baby Factory d/b/a Angelbaby_factory et al.*, No. 17-cv-1840-KPF, Dkt. 11 (S.D.N.Y. March 27, 2017); *Ontel Products Corporation v. Airbrushpainting Makeup Store a/k/a Airbrushespainting et al.*, No. 17-cv-871-KBF, Dkt. 20 (S.D.N.Y. Feb. 6, 2017); *Ideavillage Products Corp. v. Bling Boutique Store, et al.*, No. 16-cv-09039-KMW, Dkt. 9 (S.D.N.Y. Nov. 21, 2016); *Gucci America, Inc., et al v. Alibaba Group Holding LTD, et al*, No. 1:15-cv-03784-PKC (S.D.N.Y. June 23, 2015) (unpublished); *Chanel, Inc. v. Conklin Fashions, Inc.*, No. 3:15-cv-893-MAD/DEP, 2015 U.S. Dist. LEXIS 109886, at *10-13 (N.D.N.Y. Aug. 14, 2015)*; Belstaff Grp. SA v. Doe*, No. 15-cv-2242-PKC/MHD, 2015 U.S. Dist. LEXIS 178124, at *2 (S.D.N.Y. June 18, 2015); *AW Licensing, LLC v. Bao*, No. 15-cv-1373, 2015 U.S. Dist. LEXIS 177101, at *2-3 (S.D.N.Y. Apr. 1, 2015); *Klipsch Grp., Inc. v. Big Box Store Ltd.*, No. 1:12-cv-06283-VSB, 2012 U.S. Dist. LEXIS 153137, at *3-4 (S.D.N.Y. Oct. 24, 2012); *True Religion Apparel, Inc. et al. v. Xiaokang Lee et al.*, No. 1:11-cv-08242-HB (S.D.N.Y. Nov. 15, 2011) (unpublished); *N. Face Apparel Corp. v. Fujian Sharing Imp. & Exp. Ltd. Co.*, No. 1:10-cv-1630-AKH, 2011 U.S. Dist. LEXIS 158807 (S.D.N.Y. June 24, 2011); *Tory Burch, LLC v. Yong Sheng Int'l Trade Co., Ltd.*, No. 1:10-cv-09336-DAB, (S.D.N.Y. Jan. 4, 2011) (unpublished); *Chloe v. Designersimports.com USA, Inc.*, No. 07-cv-1791-CS/GAY, 2009 U.S. Dist. LEXIS 42351, at *2 (S.D.N.Y. Apr. 29, 2009); *see also In re Vuitton et Fils, S.A.*, 606 F.2d 1 (2d Cir. 1979) (holding that *ex parte* temporary restraining orders are indispensable to the commencement of an action when they are the sole method of preserving a state of affairs in which the court can provide effective final relief).

television advertising commonly called "As Seen On TV" ("ASOTV"). *See Lombardo Dec.*, ¶ 3. Plaintiff also promotes and sells its ASOTV products at the retail level at well-known mass retail outlets, including, without limitation: Wal-Mart, Target Stores, Bed Bath & Beyond, Toys R Us, Rite-Aid, CVS and Walgreens; through catalog companies; online, through its own website and its retail customers' websites; as well as through a network of international distributors, among other channels of trade. *See id.*, ¶ 4. One of Ideavillage's most popular and successful product brands is a line of copper-infused compression garments marketed and sold under the trademark COPPER FIT, including the sub-brands: Copper Fit Knee or Elbow Sleeves, Copper Fit Pro Knee or Elbow Sleeves, Copper Fit Back Pro, and Copper Fit Socks (the "Copper Fit Products"). *See id.*, ¶ 5. Plaintiff's line of Copper Fit Products has achieved great success since its introduction in August 2014, due in part to a significant marketing campaign lead by hall of fame and Super Bowl champion quarterback Brett Favre. *See id.*, ¶ 7.

While Plaintiff has gained significant common law trademark and other rights in its Copper Fit Products through use, advertising, and promotion, Plaintiff has also protected its valuable rights by filing for and obtaining federal trademark registrations. *See id.* ¶ 10. Ideavillage is the owner of U.S. Trademark Registration No. 4,676,558 for the wordmark "COPPER FIT" for goods in Class 25, U.S. Trademark Reg. No. 4,774,235 for the wordmark "COPPER FIT" for a wide variety of goods in Class 24, and U.S. Trademark Registration No. 5,301,755 for the wordmark "COPPER FIT" for a wide variety of goods in Class 25 (hereinafter collectively referred to as the "Copper Fit Marks"). *See id.*, ¶ 12, Ex. A. The Copper Fit Marks are currently in use in commerce in connection with the Copper Fit Products. The Copper Fit Marks were first used in commerce on or before the dates of first use as reflected in the registration certificates attached hereto as Exhibit A to the *Lombardo Dec.*

7

In addition, Ideavillage also owns both registered and unregistered copyrights in and related to its Copper Fit Products. *See id.*, ¶ 13. Plaintiff has protected its valuable rights by filing and obtaining United States copyright registrations in and related to the packaging of the Copper Fit Products. *See id.* For example, Ideavillage owns U.S. Copyright Reg. No. VA 1-914-217, covering the Copper Fit Elbow Sleeve packaging and instructions, U.S. Copyright Reg. No. VA 1-914-211, covering the Copper Fit Knee Sleeve packaging and instructions, U.S. Copyright Reg. No. VA 1-945-394, covering the Copper Fit Socks packaging, U.S. Copyright Reg. No. VA 1-948-947, covering the Copper Fit Back Pro packaging and U.S. Copyright Reg. No. VA 2-089-046, covering the Copper Fit Back Belt Packaging Artwork (collectively herein referred to as the "Copper Fit Works"). *See id.*, ¶ 14, *Ex.* B.

The success of the Copper Fit Products is due in part to Plaintiff's marketing and promotional efforts featuring celebrity sports spokesperson Brett Favre. *See id.*, ¶ 14. These efforts include advertising and promotion through Plaintiff's websites, television publicity, print, and other internet-based advertising, dozens of authorized major retail outlets domestically and abroad, participation in trade shows, among other efforts. *See id.* ¶ 3. Additionally, Plaintiff has spent substantial time, money, and effort in building up and developing consumer recognition, awareness, and goodwill in its Copper Fit Products, Copper Fit Marks and Copper Fit Works. *See id.*, ¶ 16. Plaintiff's success is also due to its use of the highest quality materials and processes in making the Copper Fit Products. *See id.*, ¶ 17. Further, Plaintiff owes a substantial amount of the success of the Copper Fit Products to its consumers and the word of mouth buzz that its consumers have generated. *See id.*, ¶ 18. Plaintiff has acquired a valuable reputation and goodwill among the public as a result of such association. *See id.*, ¶15.

Plaintiff has gone to great lengths to protect its interests in and to the Copper Fit Marks and

Copper Fit Works. *See id., ¶* 121. No one other than Plaintiff is authorized to manufacture, import, export, advertise, offer for sale or sell any goods utilizing the Copper Fit Marks or Copper Fit Works without the express written permission of Plaintiff. *See id.*

### B.  DEFENDANTS' UNLAWFUL AND INFRINGING CONDUCT

In light of the success of the Copper Fit Products, Plaintiff and its Copper Fit Products have become targets for unscrupulous individuals and entities that wish to exploit the goodwill, reputation and fame of the Copper Fit Products, Copper Fit Marks and Copper Fit Works, and Plaintiff routinely investigates and enforces against such unlawful activities. *See id.*, ¶ 22. Despite such efforts, Defendants have persisted in creating User Accounts and Merchant Storefronts on Wish, as well as any and all as yet undiscovered online marketplace platforms, through which they continue to advertise, distribute, offer for sale, sell and/or ship Counterfeit Products. *See Arnaiz Dec.*, ¶¶ 4-6, *Ex.* A; *Lombardo Dec.*, ¶ 23 and *Wolgang Dec.*, ¶¶ 16-19. Through Plaintiff's investigative and enforcement efforts, it learned of Defendants' counterfeiting and infringing actions, which vary and include, but are not limited to, manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale and/or selling Counterfeit Products to U.S. consumers (including those located in the State of New York) through Defendants' User Accounts. *See Lombardo Dec.*, ¶ 24.

### 1.  Plaintiff's Investigation of Defendants' User Accounts and Merchant Storefronts

As part of Plaintiff's investigative and enforcement efforts, they retained New Alchemy Limited ("NAL"), a company that provides trademark infringement research services and other intellectual property research services, to investigate and research manufacturers, wholesalers and/or third-party merchants offering for sale and/or selling Counterfeit Products on online marketplace platforms such as Wish. *See Arnaiz Dec.*, ¶ 4; *Lombardo Dec.*, ¶ 23 and *Wolgang Dec.*, ¶ 16. During its investigation, NAL identified Defendants as offering for sale and/or selling

9

Counterfeit Products through their respective User Accounts on their Merchant Storefronts and went through the majority of the process of placing an order for Counterfeit Products to determine whether the Defendants shipped Counterfeit Products to New York. *See Arnaiz Dec.*, ¶¶ 8-11, *Ex.* A; *see also Wolgang Dec.*, ¶ 23, *Ex.* C.

Additionally, NAL specified a shipping address located in New York ("New York Address") and verified that each Defendant provides shipping to the New York Address. *See id.* Purchases on Wish are made via completion of an order form and checkout page, which asks for the customer's shipping address. *See id.* In every instance, NAL completed an order form or checkout page for an order of Counterfeit Products from each Defendant either 1) through an account associated with a New York Address, or 2) by providing a New York Address as the shipping address. *See id.*, ¶ 9-10, *Ex.* A; *see also Wolgang Dec.*, ¶ 23, *Ex.* C.

As a result of its review of Defendants' User Accounts and Merchant Storefront(s), NAL confirmed that Defendants were and/or are still currently offering for sale and/or selling Counterfeit Products through their respective User Accounts, on their respective Merchant Storefront(s) and that each Defendant ships and/or has actually shipped Counterfeit Products to the U.S., including to customers specifically located in New York. *See id.*, ¶ 10, *Ex.* A; *see also Wolgang Dec.*, ¶ 23, *Ex.* C.

Through visual inspection of Defendants' listings for Counterfeit Products ("Infringing Listings"), Plaintiff and/or Plaintiff's counsel confirmed that the products that each Defendant offered for sale using virtually identical copies of the Copper Fit Marks and/or Copper Fit Works are, in fact, Counterfeit Products.[13] *See id.*, ¶ 7; *Lombardo Dec.*, ¶ 25 and *Wolgang Dec.*, ¶ 18.

---

[13]*See e.g.*, *Gucci Am., Inc. v. Tyrrell-Miller*, 678 F. Supp. 2d 117, 119 (S.D.N.Y. 2008) (Plaintiff's Intellectual Property Manager found that the products offered for sale on the Defendant's websites were non-genuine counterfeit products, based on a visual inspection of Defendant's websites); *Malletier v. 2016bagsilouisvuitton.com*, No. 16-61554-CIV-DPG, 2016 U.S. Dist. LEXIS 93072, at *3 (S.D. Fla. July 18, 2016) (Plaintiff's representative reviewed the items

Neither Plaintiff nor Plaintiff' counsel instructed NAL to complete the purchases for the Counterfeit Products from all Defendants for the following reasons: 1) shipping the Counterfeit Products from China requires significant lead times, potentially causing an unnecessary and unreasonable delay in the filing of this action; and 2) Plaintiff is able to confirm with certainty through the visual inspection of the Infringing Listings that the Counterfeit Products offered for sale by each Defendant in the Infringing Listings are, in fact, infringing, particularly given the extremely low prices at which Defendants are offering the Counterfeit Products, and no authorized Copper Fit Products whatsoever are available on Wish. *See Wolgang Dec.*, ¶ 22. Nevertheless, Plaintiff's counsel, Epstein Drangel LLP ("Epstein Drangel") made five (5) purchases of Counterfeit Products from a representative sampling of Defendants with shipping to the firm's Manhattan address. *See Wolgang Dec.*, ¶ 23, *Ex.* C. Moreover, as reflected in the copies of Defendants' Infringing Listings attached as Exhibit A to the *Arnaiz Dec.* and the side-by-side comparisons of the Copper Fit Products to Defendants' Counterfeit Products attached as Exhibit A to the *Wolgang Dec.*, Defendants' Counterfeit Products are nearly indistinguishable from the Copper Fit Products, with only minor variations that no ordinary consumer would recognize. *See Arnaiz Dec.*, *Ex.* A and *Wolgang Dec.*, *Ex.* A. Plaintiff never authorized or consented to Defendants' use of the Copper Fit Marks or Copper Fit Works, or to Defendants' offering for sale or sale of the Copper Fit Products. *See Lombardo Dec.*, ¶ 21. Representative examples of Defendants' improper use of the Copper Fit Marks and/or Copper Fit Works in the offering for

---

bearing the Louis Vuitton Marks offered for sale through Defendant's Internet websites and determined the products to be non-genuine, unauthorized versions of the Plaintiff's products.); *Chanel Inc. v. Yang*, No. C-12-04428-PJH (DMR), 2013 U.S. Dist. LEXIS 151104, at *5-6 (N.D. Cal. Aug. 13, 2013) (Plaintiff's Director of Legal Administration reviewed the various Chanel-branded products offered for sale by Defendants on each of the websites operating under the subject domain names, and determined that the products were non-genuine Chanel products); *Chanel, Inc. v. Powell*, No. C/A 2:08-0404-PMD-BM, 2009 U.S. Dist. LEXIS 127709, at *7 (D.S.C. 2009) (Plaintiff's representative personally reviewed the printouts reflecting the various Chanel brand products offered for sale by the Defendant through its website, and concluded that those products were non-genuine Chanel products).

sale and/or sale of Counterfeit Products are illustrated in Plaintiff's Complaint. *See Complaint*, ¶¶ 37-39.

### III.   <u>ARGUMENT</u>

### A.   **THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS**

Determining personal jurisdiction over a foreign defendant in a federal question case requires a two-step inquiry.  First, courts must look to the law of the forum state to determine whether personal jurisdiction will lie.  *See Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 168 (2d Cir. 2013) (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)).  Second, if jurisdiction lies, the court then considers whether the district court's exercise of personal jurisdiction over a foreign defendant comports with due process protections established under the United States Constitution.  *See id.*; *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  As alleged herein, Defendants' unlawful, counterfeiting and infringing activities subject them to long-arm jurisdiction in New York under N.Y. C.P.L.R. §§ 302(a)(1) and 302(a)(3).  Furthermore, New York's exercise of jurisdiction over Defendants thereunder comports with due process.

### 1.   <u>Defendants are Subject to Personal Jurisdiction Under N.Y. C.P.L.R. § 302(a)(1)</u>

Under § 302(a)(1), there are two requirements that must be met to establish personal jurisdiction: "(1) [t]he defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Licci*, 732 F.3d at 168 (quoting *Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006)).  In applying the test for the "transacts business" prong of § 302(a)(1), "New York decisions … tend to conflate the long-

arm statutory and constitutional analyses by focusing on the constitutional standard,"[14] ergo, "a defendant need not be physically present in New York to transact business there within the meaning of [this first prong]," so long as the defendant has engaged in "purposeful activity," for example, "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 169-71 (2d Cir. 2010) (quoting *Best Van Lines, Inc.*, 490 F.3d at 246-247) (internal quotations omitted).  The second prong of § 302(a)(1) requires an "articulable nexus or substantial relationship between the business transaction and the claim asserted," however, "a causal relationship between the business transaction and the claim asserted" is not required.  *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 93 (S.D.N.Y. 2015) (internal citations and quotations omitted).  Rather, it is sufficient that "the latter is not completely unmoored from the former."  *Id.*

In determining whether a party has "transacted business," New York courts must look at the totality of the circumstances concerning the party's interactions with, and activities within, the state.  *See Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 565 (S.D.N.Y. 2000).  Whether the exercise of personal jurisdiction is permissible in the context of Internet activity is "directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet."  *Id.* (internal citations omitted).  Courts in this Circuit have regularly conferred personal jurisdiction on a given defendant based on that defendant's operation of a fully interactive website through which consumers can access the site from anywhere and purchase products, as is the case

---

[14] *Chloe v. Queen Bee of Beverly Hills*, LLC, 616 F.3d 158, 169-71 (2d Cir. 2010) (collecting cases); *see also Seldon v. Magedson*, 11 Civ. 6218 (PAC) (MHD), 2012 U.S. Dist. LEXIS 141616, at *33 (S.D.N.Y. July 10, 2012) ("The meaning of 'transacting business' under section 302(a)(1) 'overlaps significantly' with the minimum-contacts due-process test, however, New York's long-arm statute encompasses a wider range of activity than the minimum-contacts doctrine"). *Id.*

with Defendants' User Accounts and Merchant Storefronts, which are accessible through the Wish.com, and allow for customers all over the world (including within this District) to view and purchase products, including Counterfeit Products, as demonstrated by the order forms and checkout pages completed by NAL for and Epstein Drangel's purchase of Counterfeit Products. *See Arnaiz Dec*., ¶¶ 8-11, *Ex.* A and *Wolgang Dec*., ¶ 23, *Ex*. B and C; *see, e.g.*, *Grand v. Schwarz*, No. 15-cv-8779-KMW, 2016 U.S. Dist. LEXIS 61606, at *9 (S.D.N.Y. May 10, 2016) (holding that an interactive and commercial website provides support for jurisdiction under § 302(a)(1)); *Chloe*, 616 F.3d at 170 (conferring jurisdiction where defendant operated a "highly interactive" website where bags were offered for sale to New York consumers); *Energy Brands, Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458 (S.D.N.Y. 2008) (court exercised jurisdiction based on online purchases of twenty-nine orders of bottled water by consumers in New York through an interactive website); *M. Shanken Commc'ns, Inc. v. Cigar500.com*, No. 07 Civ. 7371 (JGK), 2008 U.S. Dist. LEXIS 51997, at *13-16 (S.D.N.Y. July 7, 2008) (finding § 302(a)(1) jurisdiction over defendants because the interactive website was primarily used to effect commercial transactions, even though the website did not specifically target the New York market); *Alpha Int'l, Inc. v. T-Reproductions, Inc.*, 02 Civ. 9586 (SAS), 2003 U.S. Dist. LEXIS 11224, at *7 (S.D.N.Y. July 1, 2003) ("Websites that permit information exchange between the defendant and viewers are deemed 'interactive,' and generally support a finding of personal jurisdiction over the defendant."); *Thomas Publ'g Co. v. Indus. Quick Search*, 237 F. Supp. 2d 489, 492 (S.D.N.Y. 2002) ("If [defendant] wishes to operate an interactive website accessible in New York, there is no inequity in subjecting [defendant] to personal jurisdiction here. If [defendant] does not want its website to subject it to personal jurisdiction here, it is free to set up a passive website that does not enable [defendant] to transact business in New York.") and *Hsin Ten Enterprise USA, Inc. v. Clark*

*Enterprises*, 138 F. Supp. 2d 449, 456 (S.D.N.Y. 2000) ("Generally, an interactive website supports a finding of personal jurisdiction over the defendant.").[15]

Courts in this Circuit have also exercised jurisdiction over defendants under § 302(a)(1) where such defendants regularly offer for sale and sell goods through online marketplaces, "even though Defendants do not control their [] 'storefront' or its interactivity to the same extent that they control their own highly interactive website." *Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, No. 15 Civ. 8459 (LGS), 2016 U.S. Dist. LEXIS 89149, at *7 (S.D.N.Y. July 8, 2016) (Hon. Lorna G. Schofield held that the Michigan-based defendants who sold to New York consumers on Amazon.com were subject to this Court's personal jurisdiction); *EnviroCare Techs.*, 2012 U.S. Dist. LEXIS 78088, at *8. Jurisdiction is proper "for internet sellers who use an internet storefront like Amazon," – or in this case, Wish – when the Internet sellers are "commercial vendors who use it 'as a means for establishing regular business with a remote forum.'" *Lifeguard Licensing Corp.*, 2016 U.S. Dist. LEXIS 89149, at *8.

Accordingly, this Court has personal jurisdiction over Defendants who, although upon information and belief reside in China, have intentionally availed themselves of the opportunity to do business in New York, and specifically this District, by using Wish, as well as yet undiscovered online marketplaces, to offer for sale and/or sell Counterfeit Products. *See Arnaiz Dec.*, *Ex.* A and *Wolgang Dec.*, ¶ 23, *Ex.* C; *see also EnviroCare Techs., LLC v. Simanovsky*, 2012 U.S. Dist. LEXIS 78088, at *8 (E.D.N.Y. 2012) (concluding that jurisdiction existed where defendants sold "allegedly infringing goods . . . online through [their] Amazon storefront and the goods were shipped to New York by Amazon")).[16] Defendants used and continue to use Wish to advertise,

---

[15] *See supra* fn. 12 (collecting cases finding personal jurisdiction over China-based Defendants selling on Wish and/or similar platforms).

[16] *See also supra* note 12.

market, promote, offer for sale, sell, distribute and/or import Counterfeit Products to New York customers and/or potential customers, including in this District. *See Arnaiz Dec., Ex.* A and *Wolgang Dec.*, ¶ 23, *Ex.* C. Wish itself, which is based in San Francisco, California, targets its advertising at U.S. consumers. *See Wolgang Dec.,* ¶ 8. Defendants, who in order to use Wish must consent to its Terms of Service,[17] have or should have knowledge of Wish's focus on the U.S. economic market and its domestic consumers. Here, the fact that Defendants have chosen to open their respective User Accounts for the purpose of selling Counterfeit Products through their Merchant Storefronts on Wish as well as any and all as yet undiscovered online marketplace platforms alone supports a finding that Defendants have intentionally used Wish "as a means for establishing regular business with a remote forum." *EnviroCare Techs., LLC*, 2012 U.S. Dist. LEXIS 78088, at *10 (quoting *Boschetto v. Hansing*, 539 F.3d 1011, 1019 (9th Cir. 2008)); *see also Arnaiz Dec.*, ¶ 4 and *Wolgang Dec.,* ¶¶ 7-9. Defendants purposefully availed themselves of this Court's personal jurisdiction. *See Arnaiz Dec., Ex.* A and *Wolgang Dec.*, ¶ 23, *Ex.* C; *see also Lifeguard Licensing Corp.,* 2016 U.S. Dist. LEXIS 89149, at *8 and *EnviroCare Techs., LLC*, 2012 U.S. Dist. LEXIS 78088, at *10. Courts have indeed found that "commercial sellers" on "well-known, national . . . website[s]" are in fact subject to personal jurisdiction, as these Defendants "must have been able to foresee the possibility of being hauled into court [in the present jurisdiction]." *Malcom v. Esposito*, 63 Va. Cir. 440, 446 (Cir. Ct. 2003); *see also EnviroCare Techs., LLC,* 2012 U.S. Dist. LEXIS 78088, at *12. Although here, Plaintiff's counsel purchased five (5) Counterfeit Products from a sampling of Defendants in this Lawsuit, all shipping to the firm's Manhattan address, whether a defendant physically shipped Counterfeit Products into New York is not determinative of whether personal jurisdiction exists, as courts in this Circuit examine

---

[17] *See* WISH.COM TERMS OF USE, available at https://www.wish.com/terms.

a given defendant's online interactions with consumers in considering whether a particular defendant has transacted business in the forum state under § 302(a)(1).  *See Wolgang Dec.*, ¶ 23, *Ex.* B; *Rolex Watch, U.S.A., Inc. v. Pharel*, 09 CV 4810 (RRM) (ALC), 2011 U.S. Dist. LEXIS 32249, at 6 (E.D.N.Y. Mar. 11, 2011) (finding personal jurisdiction over defendant, a resident of South Carolina, because he transacted business in New York by monitoring and responding to inquiries for counterfeit watches through websites accessible in New York).  Plaintiff, Plaintiff's counsel and NAL have viewed Defendant's Counterfeit Products via their online User Accounts and Merchant Storefronts. *See Arnaiz Dec.,* ¶ 7; *Lombardo Dec.*, ¶ 25 and *Wolgang Dec.*, ¶ 18. NAL completed order forms or checkout pages for Counterfeit Products by providing a New York Address as the shipping address and Epstein Drangel purchased five (5) Counterfeit Products.[18]

---

[18] *See Skrodzki v. Marcello*, 810 F. Supp. 2d 501, 512-13 (E.D.N.Y. 2011), and that, "[t]he offering for sale of even one copy of an allegedly infringing item, even if no sale results, is sufficient to give personal jurisdiction over the alleged infringer under N.Y. CPLR § 302(a), subd. 1, 2 and 3." *See also, Cartier v. Seah LLC*, 598 F. Supp. 2d 422, 425 (S.D.N.Y. 2009). Moreover, under Second Circuit case law, when analyzing personal jurisdiction in the Internet context, "traditional statutory and constitutional principles remain the touchstone of the inquiry," and while a website's interactivity, "may be useful" for analyzing personal jurisdiction 'insofar as it helps to decide whether the defendant 'transacts any business' in New York,'" … "it does not amount to a separate framework for analyzing internet-based jurisdiction." *Best Van Lines, Inc.*, 490 F.3d at 252 (quoting *Best Van Lines, Inc. v. Walker*, No. 03-Civ. 6585 (GEL), 2004 U.S. Dist. LEXIS 7830, at *9 (S.D.N.Y. May 4, 2004)) (citing *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W. D. Pa. 1997)).  Sister circuits similarly rely on the traditional principles guiding the personal jurisdiction analysis when analyzing the same in the Internet context, namely the Eleventh Circuit (s*ee, e.g.*, *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1219-1224 (11th Cir. 2011) (criticizing the over-reliance on the sliding scale of interactivity analysis and instead applying a traditional personal jurisdiction analysis in an Internet case where the website was fully interactive); *see also Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1356-58 (11th Cir. 2013) (applying the traditional purposeful availment test in a case where defendant's fully interactive website was accessible in Florida, and was selling and distributing infringing goods through his website to Florida consumers), and the Seventh Circuit (*see*, e.g., *Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2010) (addressing the impact of a defendant's online activities upon the personal jurisdiction analysis and reiterating that, as with offline activities, the Court must focus upon the deliberate actions of the defendant within the State)), are instructive in considering whether the exercise of jurisdiction over Defendants in the instant action is appropriate under similar, if not identical facts.  For example, courts in the Eleventh Circuit have routinely granted temporary restraining orders, preliminary injunctions and default judgments in online counterfeiting cases where no purchases of the counterfeit/infringing products were made, but the plaintiffs alleged and confirmed that each of the foreign defendants operated fully interactive commercial websites through which they advertised, promoted, offered for sale, and sold products bearing what the plaintiff determined to be counterfeit and infringing trademarks into the U.S., and in interstate commerce, in violation of the plaintiff's rights. *See, e.g., Malletier*, 2016 U.S. Dist. LEXIS 93072, at *3; *Mycoskie v. 2016tomsshoessaleoutlet.us*, No. 16-1523- CIV-GAYLES, 2016 U.S. Dist. LEXIS 95963, at *4 (S.D. Fla. July 22, 2016); *Adidas AG v. 007adidasuk.com*, No. 15-61275-CIV-GAYLES, 2015 U.S. Dist. LEXIS 179020, at *8 (S.D. Fla. 2015); *Louis Vuitton Malletier, S.A. v. 2015shoplvhandbag.com*, No. 15-62531-CIV-BLOOM, 2015 U.S. Dist.

*See Arnaiz Dec.,* ¶¶ 8-11, *Ex.* A and *Wolgang Dec.,* ¶ 23, *Ex.* C. Thus, Defendants' sophisticated commercial operations, specifically including their offering for sale and/or selling of Counterfeit Products through their highly interactive User Accounts and Merchant Storefronts on Wish, NAL's completion of order forms and/or checkout pages for and Epstein Drangel's purchase of Counterfeit Products, along with Defendants' own representations on their Merchant Storefronts that they ship Counterfeit Products to the U.S., including the New York Address, unequivocally establishes that Defendants conduct business within this District and the claims in this suit arise from Defendants' business dealings and transactions with consumers in New York. *See id.,* ¶¶ 8-11, *Ex.* A and *Wolgang Dec.,* ¶ 23, *Ex.* C.

## 2. Alternatively, Defendants are Subject to Personal Jurisdiction Under N.Y. C.P.L.R. § 302(a)(3)

In order to establish jurisdiction under N.Y. C.P.L.R. § 302(a)(3)(ii), a plaintiff must show that 1) the defendant committed a tortious act outside of New York, 2) the tortious act caused an

---

LEXIS 181477, at *11 (S.D. Fla. Dec. 18, 2015); *Abercrombie & Fitch Trading Co. v. Abercrombieclassic.com*, No. 15-62579-CIV-CMA, 2015 U.S. Dist. LEXIS 179041, at *5 (S.D. Fla. Dec. 11, 2015); *Gucci Am., Inc. v. Gucc-Outlet.com*, No. 15-62165-CIV-DPG, 2015 U.S. Dist. LEXIS 181483, at *3-4 (S.D. Fla. Nov. 9, 2015); *Chanel, Inc. v. 2012leboyhandbag.com*, No. 15-61986-CIV-WJZ, 2015 U.S. Dist. LEXIS 177989, at *3 (S.D. Fla. Oct. 13, 2015); *Abercrombie & Fitch Trading Co. v. Abercrombieandfitchdk.com*, No. 15-62068-CIV-BB, 2015 U.S. Dist. LEXIS 179117, at *5 (S.D. Fla. Oct. 7, 2015); *Malletier v. 2015louisvuittons.com*, No. 15-61973-CIV-BB, 2015 U.S. Dist. LEXIS 181452, at *11 (S.D. Fla. Sep. 29, 2015); *Chanel, Inc. v. Chanelsstore.com*, No. 15-61156-CIV-CMA, 2015 U.S. Dist. LEXIS 179101, at *5 (S.D. Fla. August 31, 2015). Similarly, the Seventh Circuit, in *Illinois v. Hemi Group LLC*, held that it had personal jurisdiction over the foreign defendants because they operated a nationwide business model where they intentionally created and operated several commercial, interactive websites to offer products for sale and allow online orders from Illinois residents, specifically noting that the "[defendants] maintained commercial websites through which customers could purchase cigarettes, calculate their shipping charges using their zip codes, and create accounts," and as a result, the "[defendants] stood ready and willing to do business with Illinois residents." *Illinois v. Hemi Group LLC*, 622 F.3d 754, 756 (7th Cir. 2010); *see also Monster Energy Co. v. Chen Wensheng*, 136 F. Supp. 3d 897, 906 (N.D. Ill. 2015) (holding that defendants had "expressly aimed" their actions at the state, making specific personal jurisdiction proper even without a sale made to an Illinois resident, because in addition to intentionally creating and operating commercial, fully interactive AliExpress.com Internet stores through which consumers can purchase counterfeit Monster Energy Products, the defendants had affirmatively selected a shipping option to ship counterfeit products to the United States, including to Illinois residents, and the plaintiffs' exhibits showed that the named defendants had specifically offered to sell particular counterfeit products to individuals with Illinois shipping addresses and provided PayPal account number for the buyer to make the payment for the item, and as a result, the defendants expressly elected to do business with the residents of all fifty states, including Illinois).

18

injury in New York, 3) the defendant expected or should reasonably have expected the tortious act to have consequences in New York and 4) the defendant derived substantial revenue from interstate or international commerce.  *See Energy Brands Inc.*, 571 F. Supp. at 470 (citing N.Y. C.P.L.R. § 302(a)(3) (McKinney)).

Here, by advertising, offering for sale, selling, distributing and shipping retail products (all of which originate from China) directly to consumers across the world, including consumers located throughout the U.S. and specifically in New York, Defendants have committed tortious acts, as alleged herein, outside of New York, thus directly giving rise to the claims asserted in the instant action.[19]  *See Arnaiz Dec.,* ¶¶ 8-11, *Ex.* A; and *Wolgang Dec.*, ¶ 23, *Ex.* C; *see also Etna Products Co. v. Dacofa Trading Co.*, 91 Civ. 6743 (DNE), 1992 U.S. Dist. LEXIS 2924 (S.D.N.Y. March 9, 1992) (noting that copyright infringement and trade dress infringement are commercial torts committed where the infringing goods are sold and/or offered for sale).

"Courts determining whether there is injury in New York sufficient to warrant § 302(a)(3) jurisdiction must generally apply a 'situs-of-injury' test."  *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. N.Y. 2001).  Courts in this district have found that "in trademark infringement cases, the tort occurs where the passing off occurs, that is, where the customer purchases the defendant's goods in the mistaken belief that they are the trademark owner's products."  *See Energy Brands Inc.*, 571 F. Supp. at 467 (finding injury in New York in an action for trade dress infringement, noting that injury within New York encompasses "'harm to a business in the New York market through lost sales or lost customers,'" which "is satisfied by harm and threatened harm resulting from actual or potential confusion and deception of internet users in New York

---

[19] Several of the Defendants' User Accounts reflect multiple sales to consumers across the world, including repeat sales to consumers in the United States, which make up significant percentages of Defendants' total revenues (and are estimated, in several cases, to be in the millions of dollars).  *See Arnaiz Dec.*, ¶¶ 16; *Ex.* A.

State.") (internal citations omitted).  Further, this Court has often found that "in the case of commercial torts, the situs of injury is "the place where the plaintiff lost business." *A + E TV Networks, LLC v. Wish Factory*, 15-cv-1189-DAB, 2016 U.S. Dist. LEXIS 33361, at *16 (S.D.N.Y. March 11, 2016) (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 793 (2d Cir. 1999)).

Here, the injury clearly occurred within New York.  First, Plaintiff advertises, markets, promotes, distributes, displays, offers for sale and/or sells the Copper Fit Products in New York. *See Lombardo Dec*., ¶ 4, 7-8.  Second, Defendants' Infringing Listings on Wish resulted in consumers throughout the U.S., and specifically in New York, purchasing Counterfeit Products. *See Arnaiz Dec*., ¶ 8-11; *Ex.* A and *Wolang Dec*., ¶ 23, *Ex.* C.  As a direct result of Defendants' counterfeiting and infringing actions, Plaintiff has suffered harm in New York through lost sales in New York and lost New York consumers.  *See Lombardo Dec*., ¶ 30.

In determining whether a defendant "expected or should reasonably have expected" its tortious act to "have consequences in New York," courts have examined whether defendant made a 'discernible effort to directly or indirectly serve the New York market.'" *DH Servs., LLC v. Positive Impact, Inc.*, No. 12 Civ. 6153 (RA), 2014 U.S. Dist. LEXIS 14753, at *34, *37 (S.D.N.Y. Feb. 5, 2014) (internal citations omitted).  "To ensure that the provision is construed in a manner consistent with federal due process requirements, New York courts require 'tangible manifestations of a defendant's intent to target New York, or . . . concrete facts known to the nondomiciliary that should have alerted it to the possibility of being brought before a court in the Southern District of New York.'" *Id.*, at *37.  Further, "New York courts will assess whether the facts demonstrate that defendant should have been aware that its product would enter the New York market." *Energy Brands Inc*., 571 F. Supp. at 468.  Here, Defendants most certainly should

have expected their infringing actions to have consequences in New York and been aware of the fact that the Counterfeit Products would enter the New York market, given that NAL has completed order forms or checkout pages for Counterfeit Products which provide the New York Address as the shipping address and Epstein Drangel purchased Counterfeit Products from a sampling of Defendants.  *See Arnaiz Dec*., *¶¶* 8-11, *Ex*. A and *Wolgang Dec*., ¶ 23, *Ex*. C.

Finally, although "there is no bright-line rule regarding when a specific level of revenue becomes substantial for purposes of 302(a)(3)(ii)," as detailed above, there is no doubt that Defendants derive substantial revenue from U.S. interstate commerce through online sales. *Energy Brands Inc.*, 571 F. Supp. at 468; *see also Wolgang Dec.,* ¶ 4-6.

### 3.  <u>Exercising Personal Jurisdiction Over Defendants Comports With Due Process</u>

The assertion of personal jurisdiction over Defendants also comports with the Due Process Clause of the U.S. Constitution, as Defendants have "certain minimum contacts … such that maintenance of th[is] suit does not offend 'traditional notions of fair play and substantial justice.'" *Calder v. Jones*, 465 U.S. 783, 788 (1984) (quoting *Milliken v. Meyer*, 311 U.S. 457 (1940)). Defendants intentionally directed activity towards the New York market, thereby purposefully availing themselves of "the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (U.S. 1985); *see Best Van Lines, Inc.*, 490 F.3d at 243 ("In the language of minimum contacts, when the defendants committed 'their intentional, and allegedly tortious, actions expressly aimed at California, they must have reasonably anticipated being hailed into court there.'") (internal quotations omitted); *see also Arnaiz Dec*., ¶¶ 8-11, *Ex*. A and *Wolgang Dec*., ¶¶ 16-19, 23, *Ex*. C.  Moreover, "as a practical matter, the Due Process Clause permits the exercise of jurisdiction in a broader range of circumstances of N.Y. C.P.L.R. § 302, and a foreign defendant meeting the standards of § 302 will satisfy the due process standard." *Energy Brands Inc.,* 571 F. Supp. 2d at

469.   Accordingly, Plaintiff respectfully submits that this Court has personal jurisdiction over Defendants in this action.

### B.      PLAINTIFF IS ENTITLED TO AN *EX PARTE* TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

An *ex parte* order is essential in this case to prevent immediate and irreparable injury to Plaintiff.  Rule 65(b) of the Federal Rules of Civil Procedure provides, in pertinent part, that a temporary restraining order may be granted without written or oral notice to the opposing party or that party's counsel where "it clearly appears from the specific facts shown by affidavit . . . that immediate and irreparable injury, loss or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition."  Fed. R. Civ. P. 65(b).  Section 34 of the Lanham Act expressly authorizes this Court to issue *ex parte* restraining orders "with respect to a violation [of the Act] that consists of using a counterfeit mark in connection with the sale, offering for sale, or distribution of goods."  15 U.S.C. § 1116(d)(1)(a).  Congress' purpose for enacting such *ex parte* remedies was to ensure that courts were able to effectively exercise their jurisdiction in counterfeiting cases and to prevent counterfeiters given prior notice from disappearing or quickly disposing of infringing inventory or records relating to their counterfeiting and illegal actions.  *See* Senate-House Joint Explanatory Statement on trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, at 12080 (Oct. 10, 1984).

Once a violation of the Lanham Act is demonstrated, the issuance of an *ex parte* order is appropriate upon showing that: (i) the plaintiff will provide adequate security; (ii) any order other than an *ex parte* order is not adequate to achieve the purposes of 15 U.S.C. § 1114; (iii) the plaintiff has not publicized the requested *ex parte* order; (iv) the plaintiff is likely to succeed on showing that defendants are using counterfeit marks; (v) an immediate and irreparable injury will occur if such *ex parte* order is not granted; (vi) the materials to be seized will be located at the place

identified in the application; (vii) the harm to the plaintiff in denying the application outweighs the harm to defendants in granting the order and (viii) if prior notice was given, defendants would destroy, move, hide or otherwise make such matter inaccessible to the court.  *See* 15 U.S.C. § 1116(d)(4)(B).  As discussed in this Application, Plaintiff meets each of the relevant criteria for the issuance of an *ex parte* temporary restraining order under the Lanham Act.[20]  *See Lombardo Dec.* and *Wolgang Dec.*

"Courts in this Circuit have not hesitated to exercise [their] authority [to grant an *ex parte* order] in infringement cases in which there is a danger the defendants will destroy, conceal, or transfer counterfeit goods."  *Moose Toys Pty, Ltd. v. Thriftway Hylan Blvd. Drug Corp.*, No. 15-cv-4483-DLI/MDG, 2015 U.S. Dist. LEXIS 105912, at *8 (E.D.N.Y. Aug. 6, 2015).[21]  Moreover, federal courts have long recognized that civil actions against counterfeiters - whose very business is built around the deliberate misappropriation of rights and property belonging to others - present special challenges that justify proceeding on an *ex parte* basis.  *See Time Warner Entertainment Co., L.P. v. Does*, 876 F. Supp. 407, 410-11 (E.D.N.Y. 1994).

An *ex parte* temporary restraining order is particularly warranted in cases, such as the instant one, involving offshore counterfeiters who conceal their identities and engaging in unlawful and harmful counterfeiting activities over the Internet to avoid revealing their actual locations and identities.  *See Wolgang Dec.*, ¶¶ 11-14, 22.  Defendants, who, upon information and belief, are located in China and operate their businesses exclusively over the Internet, knowingly and willfully offer for sale and/or sell Counterfeit Products through their User Accounts and on their

---

[20] Plaintiff has expressed its willingness to provide security in conjunction with the *ex parte* relief it seeks.  *See* [Proposed] Order, filed herewith.  Plaintiff has certified that it has not publicized this Application.  *See Lombardo Dec.*, ¶ 32. Also, since Defendants' location and the location of the Counterfeit Products are unclear, Plaintiff is not requesting a seizure order in this Application.  *See Wolgang Dec.*, ¶¶ 24-25.
[21] *See also supra* note 12.

Merchant Storefronts on Wish.  *See Arnaiz Dec.*, ¶ 6-7, *Ex.* A; *Lombardo Dec.*, ¶ 19 and *Wolgang Dec.*, ¶¶ 3, 16-19, 23, *Ex.* C.  Given the propensity for third-party merchants on Wish, as well as other as yet undiscovered online marketplace platforms, to use aliases, false addresses and other incomplete identification information to avoid detection, if Defendants are put on notice of the filing of this Application, it is likely that Defendants will attempt to circumvent the temporary restraining order, by disappearing, destroying any evidence of their counterfeiting activities and draining their financial accounts.  *See Wolgang Dec.*, ¶¶ 13-15, 24-25.

In addition to the fact that Defendants are likely to attempt to hide evidence of their counterfeiting and infringing activities, if Defendants are given notice of this Application prior to providing the Financial Institutions and Third Party Service Providers with the time necessary to freeze Defendants' Assets and/or Defendants' Financial Accounts, it is highly likely that Defendants will move and/or deplete Defendants' Assets and/or Defendants Financial Accounts before the Financial Institutions and Third Party Service Providers can comply with the temporary restraining order.  *See id.,* ¶ 13.  Further, if provided with prior notice of this Application, Defendants are also likely to simply open new User Accounts or Merchant Storefronts on Wish, as well as any and all yet undiscovered online marketplace platforms, under new or different names and continue to offer for sale and sell Counterfeit Products with little to no consequence.  *See id.* In light of the covert nature of Defendants and their unlawful, infringing and counterfeiting activities, an order other than an *ex parte* temporary restraining order would be an exercise in futility.  The immediate and irreparable harm to Plaintiff's business and reputation – as well as to the goodwill associated with the Copper Fit Marks and Copper Fit Works – in denying their Application for an *ex parte* temporary restraining order, greatly outweighs the harm to Defendants'

interests in continuing to offer for sale and sell Counterfeit Products.[22] *See Lombardo Dec.*, ¶ 30.

It is the well settled law of this Circuit that, "[t]o obtain a preliminary injunction, a plaintiff must establish: '(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly' in its favor.'" *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005) (quoting *Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000)). The "standards which govern consideration of an application for a temporary restraining order… are the same standards as those which govern a preliminary injunction." *Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992). As detailed below, Plaintiff has met the standard for a preliminary injunction, and accordingly, a temporary restraining order should also issue against Defendants.

### 1. Plaintiff Will Suffer Irreparable Harm in the Absence of an Injunction Leaving it with No Adequate Remedy at Law

Defendants' infringing activities must be stopped immediately in order to prevent any further harm to Plaintiff. Not only does Plaintiff stand to suffer lost profits as a result of Defendants' competing substandard Counterfeit Products, but it destroys the inherent value of the Copper Fit Marks, it impairs Plaintiff's reputation for providing quality products, it dilutes Plaintiff's brand and goodwill and it negatively affects Plaintiff's relationships with its current customers (both retail sellers and ultimate consumers) and its ability to attract new customers. *See Lombardo Dec.*, ¶ 30. While courts may no longer presume irreparable harm upon a finding of infringement, *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010), "[i]rreparable harm exists in a

---

[22] *See supra* fn. 12 (collecting cases granting an *ex parte* temporary restraining order in situations where harm to plaintiffs far outweighed harm to defendants.).

trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F.Supp.2d 515, 540 (S.D.N.Y. 2011); *see also NYP Holdings v. New York Post Pub. Inc.*, 63 F. Supp. 3d 328, 341 (S.D.N.Y. 2014) ("[A]lthough irreparable harm may not be presumed upon a showing of a likelihood of success, irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . Thus, it will often be the case that a party's demonstration of a likelihood of success on a trademark claim will also show a threat of irreparable harm." (citing *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 393 (2006); *Salinger*, 607 F.3d at 80)). Further, a plaintiff may still demonstrate that "on the facts of the case, the failure to issue an injunction would actually cause irreparable harm." *Salinger*, 607 F.3d at 82 (citing *eBay*, 547 U.S. at 393); *see also WPIX, Inc. v. IVI, Inc.*, 691 F.3d 275, 285-286 (2d Cir. 2012) (upholding the district court's finding of irreparable harm in the context of a copyright infringement claim when the plaintiffs showed that the defendants' actions substantially diminished the value of the plaintiff's copyrighted work because "plaintiffs' losses would be difficult to measure and monetary damages would be insufficient to remedy the harms" and defendants "would be unable to pay damages should plaintiffs prevail").

Further, this Circuit has recognized that irreparable harm sufficient to warrant a preliminary injunction exists where defendant injected counterfeit versions of a plaintiffs' products into the market. *See CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 145 (E.D.N.Y. 2011). Here, Plaintiff has invested considerable time, money and effort to develop goodwill among customers and to create instantly recognizable products that have become popular worldwide, and Defendants have sold substandard Counterfeit Products that look remarkably similar, if not

identical, to the Copper Fit Products and which embody, bear and/or incorporate the Copper Fit Marks and/or Copper Fit Works and/or identical or confusingly and/or substantially similar marks and/or works, thereby resulting in lost sales and impairing Plaintiff's reputation that it has achieved through the expenditure of considerable time and effort.[23]  *See Lombardo Dec.*, ¶¶ 25, 30 and *Wolgang Dec.*, ¶¶ 16-19.

Moreover, Defendants' counterfeiting and infringing activities deny Plaintiff of its fundamental right to control the quality of the goods sold under its Copper Fit Marks.  *See Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009) (internal quotation marks omitted) (affirming district court's grant of preliminary injunction) (quoting *El Greco Leather Products Co. v. Shoe World, Inc.,* 806 F.2d 392, 395 (2d Cir. 1986), *cert. denied,* 484 U.S. 817 (1987)) ("[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark.").  Defendants are offering their substandard Counterfeit Products, in wholesale quantities, at significantly below-market prices with which Plaintiff cannot compete given the high-quality materials and construction necessary to manufacture the Copper Fit Products.  *See Lombardo Dec.*, ¶ 27; *Wolgang Dec.*, ¶¶ 19-21 and *Zino Davidoff SA*, 71 F.3d 244 (holding that irreparable harm is caused to a trademark owner who cannot control the quality of their products because "a higher incidence of substantial sales of counterfeit goods, which are invariably non-conforming and inferior" would "harm [Plaintiffs'] reputation and diminish the value of its trademark."); *see also Mint, Inc. v. Iddi Amad*, No. 10-cv-9395-SAS, 2011 U.S. Dist. LEXIS 49813, at *9 n.23 (S.D.N.Y. May 9, 2011) ("the loss of pricing power resulting from the sale of inexpensive 'knock-offs' is, by its very nature, irreparable) (citing *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir.

---

[23] *See Mitchell Grp. USA LLC v. Udeh*, 2015 U.S. Dist. LEXIS 18801, at *8 (E.D.N.Y. 2015) (internal citations omitted).

2008) (citing *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (likelihood of price erosion and loss of market position are evidence of irreparable harm); *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975-76 (Fed. Cir. 1996) (loss of market opportunities cannot be quantified or adequately compensated and is evidence of irreparable harm)).

Also, because Defendants' substandard Counterfeit Products are virtually indistinguishable from the Copper Fit Products, not only could any injury to consumers that results from such consumers' use of Defendants' substandard Counterfeit Products be attributed to Plaintiff, thereby causing irreparable harm to Plaintiff in the form of unquantifiable lost sales, loss of goodwill and loss of control of its reputation with authorized licensees, retailers and consumers, but Plaintiff potentially could be exposed to legal liability for any such injury to consumers. *See Lombardo Dec.*, ¶ 30 and *Wolgang Dec.*, ¶¶ 16-19. Thus, this factor weighs heavily in Plaintiff's favor.

### 2. <u>Plaintiff is Likely to Prevail on the Merits of its Lanham Act Claims</u>

In order to establish a likelihood of success on trademark counterfeiting and infringement claims, a plaintiff must show: (1) that its marks are valid and entitled to protection, and (2) that defendants' use of plaintiff's marks is likely to cause confusion. *See Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010).

As a preliminary matter, the U.S. Trademark Registration certificates submitted in conjunction with this application provide *prima facie* evidence of both the validity of the Copper Fit Marks, as well as Plaintiff's ownership of the same. *See Lombardo Dec.*, ¶ 12, *Ex.* A; *see also* 15 U.S.C. § 1057(b).

Generally, a proper likelihood of confusion inquiry involves an analysis of the factors set

forth in *Polaroid Corp. v. Polarad Elecs. Corp.*: (1) the strength of the plaintiff's mark; (2) the similarity between the two marks; (3) the competitive proximity of the parties' products in the marketplace; (4) the likelihood that the senior user will bridge the gap, if any, between the products; (5) evidence of actual confusion; (6) the defendant's bad faith; (7) the quality of the defendant's product and (8) the sophistication of the relevant consumer group.  287 F.2d 492, 495 (2d Cir. 1961).  Yet, "where counterfeit marks are involved, it is not necessary to conduct the step-by-step examination of each *Polaroid* factor because counterfeit marks are inherently confusing." *Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368, 383 (S.D.N.Y. 2010) (quoting *Burberry Ltd. v. Euro Moda, Inc*., No. 08-cv-5781-CM, 2009 U.S. Dist. LEXIS 53250, at *5 (S.D.N.Y. June 10, 2009) (internal citations omitted)); *see also Gucci Am., Inc. v. Duty Free Apparel, Ltd*., 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003).  Instead, "[t]he court need only determine the more fundamental question of whether there are items to be confused in the first place -- that is, whether the items at issue . . . are, in fact, counterfeit and whether [d]efendants sold those items, or offered those items for sale."  *Fendi Adele S.R.L.*, 696 F. Supp. 2d at 383 (internal citations omitted).  "Sellers bear strict liability for violations of the Lanham Act." *Id.*  Regardless, even if a *Polaroid* analysis were necessary, a straightforward application of the test clearly demonstrates that a likelihood of confusion exists in this case.

Finally, because Plaintiff has shown that it is likely to prevail on its trademark counterfeiting and trademark infringement claims, Plaintiff has also shown that it will likely prevail on its claims for false designation of origin, passing off and unfair competition.  *See Richemont N. Am., Inc. v. Linda Lin Huang*, No. 12-cv-4443-KBF, 2013 U.S. Dist. LEXIS 136790, at *14-16 n.15 (S.D.N.Y. Sep. 24, 2013) (quoting *New West Corp. v. NYM Co. of California, Inc.,* 595 F.2d 1194, 1201 (9th Cir. 1979)); *Le Book Publ'g, Inc. v. Black Book Photography, Inc.*,

418 F. Supp. 2d 305, 312 (S.D.N.Y. 2005) (quoting *New West Corp. v. NYM Co. of California, Inc.,* 595 F.2d 1194, 1201 (9th Cir. 1979)) ("'[W]hether we call the violation infringement, unfair competition or false designation or origin, the test is identical.'").

      **a) *The Copper Fit Marks are Strong and Distinctive***

      In determining the strength of a mark, courts look to: "(1) inherent strength, resulting from the mark's degree of inherent distinctiveness, usually measured on the ladder ranging from unprotectable generic marks to arbitrary, fanciful marks that enjoy the broadest protection, and (2) acquired strength, reflecting the degree of consumer recognition the mark has achieved." *Tcpip Holding Co. v. Haar Communs. Inc.*, 244 F.3d 88, 100 (2d Cir. 2001). The Copper Fit Marks are suggestive as applied to the goods with which they are associated, and have acquired distinctiveness from being prominently used in connection with the Copper Fit Products, which have achieved worldwide recognition and fame. *See Lombardo Dec.*, ¶ 3, 12, *Ex*. A. Additionally, Plaintiff's federal trademark registrations for the Copper Fit Marks further demonstrates the strength of the same. *See id.*; *see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986) ("[R]egistered trademarks are presumed to be distinctive and should be afforded the utmost protection"). Likewise, the Copper Fit Marks are suggestive as applied to the goods with which they are associated, as each "requires imagination, thought and perception to reach a conclusion as to the nature of the goods," and thus, the Copper Fit Marks are inherently distinctive and are thereby entitled to trademark protection "without proof of secondary meaning." *Stix Prods., Inc. v. United Merchants & Mfrs., Inc.*, 295 F. Supp. 479, 488 (S.D.N.Y. 1968); *see also Thompson Medical Co., v. Pfizer Inc.*, 753 F.2d 208, 216 (2d Cir. 1985); *Bernard v. Commerce Drug Co.*, 774 F. Supp. 103 (E.D.N.Y. 1991) (applying the aforementioned standards in the context of an unregistered trademark). Thus, this factor weighs in Plaintiff's favor.

**b)** ***Defendants' Counterfeit Products and Marks are Virtually Identical to the Copper Fit Products and Copper Fit Marks***

Defendants have applied identical copies of the Copper Fit Marks to their substandard, Counterfeit Products and/or used identical copies of the Copper Fit Marks in marketing and promoting their substandard, Counterfeit Products at Defendants' User Accounts and Merchant Storefronts; as such, this factor weighs in favor of Plaintiff. *See Arnaiz Dec.*, ¶¶ 6-7, *Ex.* A; *Lombardo Dec.*, ¶¶ 23-25 and *Wolgang Dec.*, ¶¶ 16-18. Defendants' Counterfeit Products are clearly designed to look as much like the Copper Fit Products as possible, without the quality and workmanship of the Copper Fit Products. *See Lombardo Dec.*, ¶ 25 and *Wolgang Dec.*, ¶¶ 18; *see also Rado Watch Co. v. ABC, Co.*, 92-cv-3657-PKL, 1992 U.S. Dist. LEXIS 8356, at *11 (S.D.N.Y. June 8, 1992) (finding that the similarity of the marks weighed heavily in plaintiff's favor where it is "exceedingly difficult" to distinguish between authentic and infringing goods, "even in a side-by-side comparison"). Only minor differences exist between the Counterfeit Products and the Copper Fit Products, which have no bearing on a finding of likelihood of confusion. *See Arnaiz Dec.*, ¶¶ 6-7, *Ex.* A; *Lombardo Dec.*, ¶ 25 and *Wolgang Dec.*, ¶¶ 16-18.; *see also Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1004-1005 (2d Cir. 1997) (holding that the test for confusion is "whether they create the same general overall impression such that a consumer who has seen" the authentic product would, when seeing the infringing product, be confused). Further, courts do "not look with much favor on the businessman who, out of the wealth of words available, chooses as a trademark one which comes as close as he dares to a well-known mark on the identical product." *A. T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir. 1972).

31

**c) *Defendants' Counterfeit Products Directly Compete with the Copper Fit Products and There is No Gap to Bridge***

In considering the proximity of the products in the market, the concern is "competitive proximity," meaning "whether and to what extent the two products compete with each other." *Cadbury Beverages Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996).  In assessing the proximity of the parties' products, courts "look to the nature of the products themselves and the structure of the relevant market. Among the considerations germane to the structure of the market are the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold." *Id.* (citations and internal quotations omitted). "[T]he closer the secondary user's goods are to those the consumer has seen marketed under the prior user's band, the more likely that the consumer will mistakenly assume a common source."*Virgin Enterprises v. Nawab*, 335 F.3d 141, 150 (2d Cir. 2003).  In this case, the class of customers for both the Counterfeit Products and the Copper Fit Products are the same retail consumers, so this factor weighs in favor of Plaintiff.

Further, where, as here, Defendants are offering for sale and selling products that are virtually identical in kind, but not in quality to the Copper Fit Products, bearing counterfeit and/or infringing marks in the same class of goods under which Plaintiff sells its Copper Fit Products, they are already in competitive proximity and there is no "gap" to bridge.  *See Arnaiz Dec.*, ¶¶ 6-7, *Ex.* A; *Lombardo Dec.*, ¶ 25; *Wolgang Dec.*, ¶¶ 16-18; *Starbucks Corp. v. Wolfe's Borough Coffee, Inc*., 588 F.3d 97, 115 (2d Cir. 2009) (This factor "is irrelevant . . . where . . . the two products are in direct competition with each other."); *see also Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005) (concluding that "[b]ecause . . . [the] products are already in competitive proximity, there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis") and *Pfizer, Inc. v. Y2K Shipping & Trading, Inc*., 00-cv-5304-SJ, 2004 U.S.

Dist. LEXIS 10426, at *15-16 (E.D.N.Y. March 26, 2004) (citations omitted) ("Where the products are competitive, there is no gap to bridge and the likelihood of confusion is greater.").

### d) *Actual Confusion Can Be Inferred Between Defendants' Counterfeit Products and the Copper Fit Products*

Seeing as Defendants are offering for sale and/or selling counterfeit versions of the Copper Fit Products under one or more of the Copper Fit Marks, or a confusingly similar mark, actual confusion can be inferred.  *See Arnaiz Dec.*, ¶¶ 6-7, *Ex.* A; *Lombardo Dec.*, ¶ 25 and *Wolgang Dec.*, ¶¶ 16-18, *Ex.* A.  Notwithstanding, Plaintiff does not need to prove actual confusion, only a likelihood of confusion to obtain equitable relief.  *See Prot. One Alarm Monitoring, Inc. v. Exec. Prot. One Sec. Serv., LLC*, 553 F. Supp. 2d 201, 206 (E.D.N.Y. 2008) (quoting *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2d Cir. 1981)) ("To obtain an injunction in a trademark case the plaintiff need show 'only a likelihood of confusion or deception … in order to obtain equitable relief.'").

### e) *Defendants Acted in Bad Faith*

Given that Defendants' choice of marks, which are virtually identical to the Copper Fit Marks and used in connection with the offering for sale and/or sale of virtually identical products, it can be presumed that Defendants intended to trade off the goodwill and reputation of Plaintiff, its Copper Fit Products and its Copper Fit Marks.  *See Arnaiz Dec.*, ¶ 7, *Ex.* A; *Lombardo Dec.*, ¶ 25 and *Wolgang Dec.*, ¶ 18*; see also Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 132 (S.D.N.Y. 1993) ("When a company appropriates an identical mark that is well known and has acquired a secondary meaning, an inference can be drawn that the company intends to capitalize on the goodwill and reputation of the mark as well as any confusion that might result concerning the common origin of that mark and the senior user's product.").[24] If Defendants'

---

[24] *See also Toys "R" Us, Inc..*, 559 F. Supp. 1189, 1199 (E.D.N.Y. 1983) (citing *E.I. duPont de Nemours & Co. v. Yoshida International, Inc.*, 393 F. Supp. 502, 514 (E.D.N.Y. 1975)) ("On the assumption that a businessman will

counterfeiting and infringing actions are found to be willful, "likelihood of confusion will be presumed as a matter of law." *N.Y. State Soc'y of CPA's v. Eric Louis Assocs.*, 79 F. Supp. 2d 331, 340 (S.D.N.Y. 1999).

### f)  Defendants' Counterfeit Products Are of Inferior Quality

The Copper Fit Products are manufactured with high quality materials. *See Lombardo Dec.* ¶ 22.  Plaintiff has neither authorized Defendants' use of the Copper Fit Marks or confusingly similar marks in connection with the Counterfeit Products nor approved or tested Defendants' Counterfeit Products being offered for sale and/or sold under or in connection with the Copper Fit Marks and/or confusingly similar marks.  *See Lombardo Dec.* ¶ 26.  Hence, Defendants have encroached on Plaintiff's right to control the quality of the goods manufactured and sold under its Copper Fit Marks.  *See Polymer Technology Corp. v. Mimran*, 975 F.2d 58, 62 (2d Cir. 1992) (quoting *El Greco Leather Products Co.,* 806 F.2d at 395) ("'One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark . . . the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain'").  In light of the above, this factor further supports a finding of likelihood of confusion.

### g)  The Sophistication of Purchasers

"Where the purchasers of a products are highly trained professionals, they know the market and are less likely than untrained consumers to be misled or confused by the similarity of

---

ordinarily act to his commercial advantage, and that the attraction of an established business' good will to the newcomer's product is such an advantage, the inference to be drawn from imitation is the imitator's own expectation of confusion as to the source of origin of his product. Where, as here, there is little to distinguish the marks themselves and the prior mark is a long-established one of which the newcomer was aware, doubts about intent are resolved against the newcomer, and a reasonable explanation of its choice is essential to establish lack of intent to deceive.") and *Gucci America, Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060, 1065 (S.D.N.Y. 1991) ("Where the evidence "shows or requires the inference that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up, then the inference of likelihood of confusion is readily drawn, for the very act of the adopter has indicated that he expects confusion and resultant profit.") (internal citation omitted).

different marks." *Virgin Enters. Ltd. v. Nawab,* 335 F.3d 141, 151 (2d Cir. 2003).   In contrast, ordinary "retail customers," (*i.e.*, the consumers of Plaintiff's and Defendants' products), "are not expected to exercise the same degree of care as professional buyers, who are expected to have greater powers of discrimination." *Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, 778 F. Supp. 2d 261, 268-269 (E.D.N.Y. 2011) (citing *Virgin Enterprises*, 335 F.3d at 151) (quoting district court). Thus, this factor favors Plaintiff's likelihood of success on the merits.

### 3.   Plaintiff is Likely to Prevail on its Copyright Act Claims

Under 17 U.S.C. § 501(a), in order to show likelihood of success on the merits of a copyright infringement claim, a given plaintiff must demonstrate: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011) (quoting *Feist Publ'ns, Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340, 361 (1991)).  As detailed below, Defendants have infringed upon the Copper Fit Works.

#### a)  *Plaintiff owns Valid Copyrights in the Copper Fit Works*

With respect to ownership, "[a] certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright." *Mint, Inc.*, 2011 U.S. Dist. LEXIS 49813, at *6; *see also* 17 U.S.C. § 410(c). Thus, Plaintiff's certificates of registration for the Copper Fit Works are *prima facie* evidence of the validity of the copyrights and the facts stated in such registrations. *See Lombardo Dec.*, ¶ 15, *Ex.* B.

#### b)  *Defendants Infringed the Copper Fit Works*

To establish infringement, "the copyright owner must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible [sic] elements of plaintiff's [work]." *Yurman Design, Inc. v. PAJ Inc.,* 262 F.3d 101, 110 (2d Cir. 2001).

A plaintiff may demonstrate actual copying "either by direct or indirect evidence." *P&G v. Colgate-Palmolive Co.*, 199 F.3d 74, 77 (2d Cir. 1999) (internal citations omitted). "Indirect copying may be shown by demonstrating that the defendant had access to the copyrighted work and that the similarities between the works are probative of copying." *Id.* "Generally, an allegedly infringing work is considered substantially similar to a copyrighted work if the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Mint, Inc.*, 2011 U.S. Dist. LEXIS 49813, at *7 n.16 (quoting *Boisson v. Banian, Ltd.*, 273 F.3d 262, 272 (2d Cir. 2001)).

In the instant matter, a representative sample of side-by-side comparisons of Plaintiff's Copper Fit Works to Defendants' Infringing Products and/or Defendants' Infringing Listings, as depicted in Exhibit A to the *Wolgang Dec.*, illustrates that Defendants are copying one or more of the Copper Fit Works by reproducing and/or displaying substantially similar, if not identical, imitations of the Copper Fit Works either embodied in the Infringing Products themselves and/or in connection with the offering for sale and/or sale of Infringing Products. *See Arnaiz Dec.*, ¶¶ 6-7, *Ex.* A; *Lombardo Dec.*, ¶ 25; and *Wolgang Dec.*, ¶¶ 16-18, *Ex.* A. Without doubt, Defendants have taken the original and well-known elements of the Copper Fit Works – comprised of the associated artwork used in the packaging for the Copper Fit Products – and used the same and/or elements thereof in Defendants' Infringing Listings for their Infringing Products. *See Wolgang Dec.*, ¶¶ 16-18, *Ex.* A. In addition, the fact that Defendants' imitations of the Copper Fit Works are virtually indistinguishable therefrom, coupled with Plaintiff's significant and widespread advertising efforts, further demonstrates that Defendants unquestionably had "access" to the Copper Fit Works. *See id.*; *Mint, Inc.*, 2011 U.S. Dist. LEXIS 49813, at *7; and *Stora v. Don't Ask Why Outfitters,* 2016 U.S. Dist. LEXIS 170172, at *12 (E.D.N.Y. Dec. 7, 2016). Plaintiff has

adduced evidence showing its widespread use of its Copper Fit Works as well as the extensive advertising and widespread distribution of the Copper Fit Products, thereby demonstrating that Plaintiff's assertion of Defendants' access to the Copper Fit Works is more than mere speculation. Instead, Plaintiff has demonstrated, at a minimum, "evidence of a reasonable possibility of access." *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988).

Moreover, Defendants' infringing use of the Copper Fit Works is clearly more than *de minimis*. As detailed *supra*, the elements copied by Defendants from the Copper Fit Works are original to Plaintiff. Nevertheless, Defendants have taken entire and/or core elements of the Copper Fit Works and have used these, or nearly identical replicas thereof, in connection with the advertising, marketing, distributing, offering for sale and/or sale of the Infringing Products. In many instances, Defendants have directly copied one or more of the individual components of the Copper Fit Works, and have used such elements together in Defendants' Infringing Listings. *See Wolgang Dec*., ¶¶ 16-18, *Ex*. A, and *Arnaiz Dec.*, *Ex.* A. Thus, Plaintiff has established substantial similarity between the Copper Fit Works and Defendants' imitations, and that Defendants copied the same. *See Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003) (finding that a near-exact copy was substantially similar and therefore, infringing, when such a copy incorporated plaintiff's original selections, even though the copy contained additional elements). Accordingly, Plaintiff respectfully submits that it is likely to succeed on the merits of their copyright claims

### 4.  **Plaintiff is Likely to Prevail on its State Law Claims**

Because Plaintiff has shown a likelihood of success on its Lanham Act claims, Plaintiff respectfully submits that it has also shown a likelihood of success on its deceptive trade practices, false advertising, unfair competition and unjust enrichment claims under New York State law. *See*

*N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 521 (S.D.N.Y. 2013) ("The analysis of the merits of plaintiff's state law claims [including false advertising] is not materially different"); *Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*, 348 F. Supp. 2d 165, 177-178, n. 6 (S.D.N.Y. 2004) ("the standards for analysis for plaintiff's New York state law claims [for false advertising and false marketing] are the same as those for analysis of the Lanham Act claims in all relevant respects") and *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273 (S.D.N.Y. 2002) (likelihood of success on federal infringement claims supports likelihood of success on New York state unfair competition and deceptive business practices).

### 5. The Balance of Hardships Favors Plaintiff

The balance of hardships unquestionably and overwhelmingly favors Plaintiff in this case. Here, as described above, Plaintiff has suffered, and will continue to suffer, irreparable harm to their business, the value, goodwill and reputation built up in and associated with the Copper Fit Marks and Copper Fit Works and to their reputation as a result of Defendants' willful and knowing sales of substandard imitations of the Copper Fit Product. *See Lombardo Dec.*, ¶ 30. In contrast, any harm to Defendants would only be the loss of Defendants' ability to continue to offer their Counterfeit Products for sale, or, in other words, the loss of the benefit of being allowed to continue to unfairly profit from their illegal and infringing activities. "Indeed, to the extent defendants 'elect[] to build a business on products found to infringe[,] [they] cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Broad. Music, Inc. v. Prana Hosp.*, Inc., 158 F. Supp. 3d 184, 196 (S.D.N.Y. 2016) (quoting *Mint, Inc. v. Amad*, 2011 U.S. Dist. LEXIS 49813, at *3 (S.D.N.Y. 2011) (internal quotation marks and citation omitted)); *see also Mitchell Group USA LLC*, No. 14-cv-5745-DLI/JO, 2014 U.S. Dist. LEXIS 143001, at *6-7 (E.D.N.Y Feb. 17, 2014) (citing *Philip Morris USA Inc. v. 5 Bros. Grocery Corp.*,

No. 13-cv-2451-DLI/SMG, 2014 U.S. Dist. LEXIS 112274 (E.D.N.Y. Aug. 5, 2014) ("Absent an injunction, there will be further erosion of plaintiff's goodwill and reputation. Defendants, on the other hand, will be called upon to do no more than refrain from what they have no right to do in the first place.")).

6. **Enjoining Defendants from Using the Copper Fit Marks and Copper Fit Works Will Serve the Public Interest**

The public interest will be served by the issuance of a temporary restraining order and preliminary injunction, as "the public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010); *see also CJ Prods. LLC*, 809 F. Supp. 2d at 149 ("the public interest is served by preventing customer confusion or deception"). Here, the public has an interest in being able to rely on the high quality of the Copper Fit Products bearing and/or sold in connection with the Copper Fit Marks and Copper Fit Works. Since Defendants have willfully and knowingly inserted substandard Counterfeit Products into the marketplace, the public would benefit from a temporary restraining order and preliminary injunction halting any further sale and distribution of Defendants' Counterfeit Products. *See Arnaiz Dec.*, ¶¶ 6-7, *Ex.* A and *Wolgang Dec.*, ¶¶ 18-19.

C. **PLAINTIFF IS ENTITLED TO AN ORDER PREVENTING 1) THE FRAUDULENT TRANSFER OF ASSETS AND 2) FREEZING OF DEFENDANTS' MERCHANT STOREFRONTS**

1. **Defendants' Assets Must be Frozen**

Considering the nature of Defendants' counterfeiting businesses and Plaintiff showing that it has a high likelihood of succeeding on the merits of all of its claims, Plaintiff will be entitled to an equitable accounting of Defendants' profits from their sales of Counterfeit Products. Accordingly, Plaintiff's request for an asset freeze order granting Plaintiff information regarding

the location of all money, securities or other property or assets of Defendants (whether said assets are located in the U.S. or abroad) ("Defendants' Assets"), the attachment of Defendants' Assets and an injunction preventing the transfer from or to financial accounts associated with or utilized by any Defendants or any Defendants' User Accounts or Merchant Storefront(s) (whether said account is located in the U.S. or abroad) ("Defendants' Financial Accounts") by any banks, financial institutions, credit card companies and payment processing agencies, such as ContextLogic, PayPal Inc. ("PayPal"), Payoneer Inc. ("Payoneer"), the Alibaba Group d/b/a Alibaba.com and Aliexpress.com ("Alibaba") payment services (*e.g.*, Alipay.com Co., Ltd., Ant Financial Services Group), PingPong Global Solutions, Inc. ("PingPong"), and other companies or agencies that engage in the processing or transfer of money and/or real or personal property of Defendants (collectively, "Financial Institutions") and online marketplace platforms, including, without limitation, those owned and operated, directly or indirectly, by ContextLogic, such as Wish, as well as any and all as yet undiscovered online marketplace platforms and/or entities through which Defendants, their respective officers, employees, agents, servants and all persons in active concert or participation with any of them manufacture, import, export, advertise, market, promote, distribute, offer for sale, sell and/or otherwise deal in Counterfeit Products which are hereinafter identified as a result of any order entered in this action, or otherwise  ("Third Party Service Providers") is both necessary and appropriate, and is within this court's discretion to preserve Plaintiff's right to the relief sought in the Complaint.  *See* 15 U.S.C. § 1117(a); *see also*, *e.g.*, *Balenciaga Am., Inc. v. Dollinger*, No. 10-cv-2912-LTS, 2010 U.S. Dist. LEXIS 107733, at *22 (S.D.N.Y. Oct. 8, 2010) (citing *Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, No. 00-cv-8051-JSM, 2000 U.S. Dist. LEXIS 15664, at *4 (S.D.N.Y. 2000) ("[W]here plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains it equitable power to freeze

assets."); *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 71-72 (2d Cir. 1998) ("A district court faced with a Lanham Act violation possesses some degree of discretion in shaping [the] relief according to the principles of equity and the individual circumstances of each case" within the parameters of allowing an accounting for profits); *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992); *Tiffany (NJ) LLC v. Forbse*, No. 11-cv-4976-NRB, 2012 U.S. Dist. LEXIS 72148, at *34 (S.D.N.Y. May 23, 2012) and *Warner Bros. Entm't Inc. v. Doe*, No. 14-cv-3492-KPF, 2014 U.S. Dist. LEXIS 190098 (S.D.N.Y. May 29, 2014).

Plaintiff may obtain an order restraining Defendants' Assets by demonstrating a "likelihood of dissipation of the claimed assets, or other inability to recover money damages, if relief is not granted." *Datatech Enters. LLC v. FF Magnat Ltd.,* No. 12-cv-04500-CRB, 2012 U.S. Dist. LEXIS 131711, at *12 (N.D. Cal. Sept. 14, 2012) (citing *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009)). District courts have the "authority to freeze those assets which could [be] used to satisfy an equitable award of profits." *North Face Apparel Corp. v. TC Fashions, Inc.*, No. 05-cv-9083-RMB, 2006 U.S. Dist LEXIS 14226, at *10 (S.D.N.Y. Mar. 30, 2006) (internal citation omitted). In doing so, a court "may exempt any particular assets from the freeze on the ground that they [are] not linked to the profits of allegedly illegal activity." *Id.* at *11. Yet, the onus is on "the party seeking relief [from any such asset freeze] to 'present documentary proof'" that its profits do not stem from such illegal activity. *Id.*

Under 15 U.S.C. § 1117(a) and 17 U.S.C. § 504(b), a plaintiff in an action arising thereunder is entitled to recover a defendant's profits derived from the counterfeiting and/or infringement and/or plaintiff's damages. The Supreme Court specifically held that a copyright and/or trademark "infringer is required *in equity to account* for and yield up his gains to the true

41

owner," and "profits are then allowed as an *equitable* measure of compensation." *Gucci Am. v. Bank of China*, 768 F.3d 122, 131-132 (2d Cir. 2014) (quoting *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 259 (1916) (emphasis added) and  *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 399 (1940)).  ("[R]ecovery [of profits] had been allowed in equity [prior to the statutory remedy] both in copyright and patent cases as appropriate equitable relief incident to a decree for an injunction."); *see also Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014) (noting that recovery of profits "is not easily characterized as legal or equitable," but treating profit-recovery remedy under Copyright Act as "equitable") (internal citation omitted). Specifically, with respect to claims involving the infringement of federally registered copyrighted works and/or those arising under the Lanham Act, it has been established in this Circuit, as well as sister circuits, that district courts have the authority to issue a prejudgment asset restraint injunction in favor of plaintiffs seeking an accounting and/or another equitable remedy against allegedly infringing defendants. *See, e.g.*, *Warner Bros. Entm't Inc. v. Doe,* 2014 U.S. Dist. LEXIS 190098 (S.D.N.Y. May 29, 2014); *Microsoft Corp. v. Jun Yan*, 2010 U.S. Dist. LEXIS 14934 (Dist. Conn. Feb. 18, 2010); *CBS Broad. Inc. v. PrimeTime 24 J.V.*, 1999 U.S. Dist. LEXIS 6515 (S.D. Fla. Feb. 18, 1999) (granting Emergency Motion to Prevent Dissipation of Defendant's Revenues from Retransmission in context of a copyright infringement action, finding that the court's equitable powers authorized it to do so and that plaintiffs sought an equitable remedy, despite the fact that the Copyright Act explicitly authorized the award that plaintiffs sought); *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982 (11th Cir. 1995) (finding that the district court had the authority to freeze assets that could have been used to satisfy an equitable award of profits pursuant to 15 U.S.C. § 1117) and *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 560 (9th Cir. 1992) ("Because the Lanham Act authorizes the district court to grant Reebok

an accounting of Betech's profits as a form of final equitable relief, the district court had the inherent power to freeze Betech's assets in order to ensure the availability of that final relief."); and *Venus Fashion, Inc. v. Changchun Chengji Tech. Co.*, No. 16-cv-61752, 2016 U.S. Dist. LEXIS 188384 (S.D. Fla. July 22, 2016) (granting prejudgment asset freeze in context of copyright infringement action).

An asset freeze in the instant matter is unquestionably warranted because Defendants, who are foreign individuals and/or entities based in China, are manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale and/or selling Counterfeit Products to U.S. consumers solely via the Internet, and accepting payment for such Counterfeit Products in U.S. Dollars through Financial Institutions, thereby causing irreparable harm to Plaintiff in the form of lost sales, loss of goodwill and loss of control of its reputation with licensees, retailers and consumers, and can, and most certainly have the incentive to, transfer and hide their ill-gotten funds if their assets are not frozen. *See Arnaiz Dec.*, ¶¶ 6-11, *Ex.* A; *Wolgang Dec.*, ¶ 18-21; *Dama S.P.A. v. Doe*, 2015 U.S. Dist. LEXIS 178076, at *4-6 (S.D.N.Y. June 12, 2015) (agreeing that, "Plaintiff's concerns regarding the likelihood of dissipating assets merit the extraordinary remedy of *ex parte* relief and that there is a strong likelihood that advance notice of the motion would cause Defendants to drain their PayPal accounts, thereby depriving Plaintiff of the remedy it seeks") and *SEC v. Caledonian Bank Ltd.*, 317 F.R.D. 358 (S.D.N.Y. 2016) (granting plaintiff's request for an *ex parte* asset freeze based on plaintiff's assertion that Defendants were foreign entities, and therefore could easily move assets out of bank or brokerage accounts at a moment's notice).[25] Therefore, Plaintiff respectfully submits that this Court should exercise its inherent equitable power and freeze Defendants' Assets and Defendants' Financial Accounts for

---

[25] *See also supra* fn. 12.

the purpose of preserving Defendants' funds and ensuring that a meaningful accounting of their profits can be made.  Upon the entering of an asset freeze, Plaintiff also requests that the Court order Defendants and/or the Financial Institutions and/or the Third Party Service Providers to immediately identify Defendants' Assets and Defendants' Financial Accounts and the respective current account or fund balances of the same.

### 2.   Defendants' User Accounts and Merchant Storefronts Must be Frozen

A temporary restraining order which, in part, restrains and enjoins Wish, as well as any and all as yet undiscovered online marketplace platforms, from providing services to Defendants' User Accounts and Merchant Storefronts is warranted and necessary because the continued offering for sale and/or sale of the Counterfeit Products by Defendants on their Merchant Storefronts through their User Accounts will result in immediate and irreparable injury to Plaintiff, as described above. *See Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 126 (2d Cir. 2014) (Hon. Richard J. Sullivan entered a temporary restraining order, which, in part, enjoined the sale of counterfeit goods on the Internet) and *AW Licensing, LLC v. Bao*, No. 15-cv-1373, 2015 U.S. Dist. LEXIS 177101, at *3 (S.D.N.Y. Apr. 1, 2015) (Hon. Katherine B. Forrest entered a temporary restraining order which was subsequently converted into a preliminary injunction, which, in part, disabled the defendants' websites, which were their means of distributing, offering for sale and selling counterfeit products.).[26]

### D.   PLAINTIFF IS ENTITLED TO AN ORDER AUTHORIZING ALTERNATIVE SERVICE OF PROCESS BY ELECTRONIC MEANS

Plaintiff also respectfully requests that this Court issue an order granting it permission to serve each respective Defendant via the following combination of electronic methods: 1) registered electronic mail and 2) website publication.  Since, upon information and belief, Defendants are

---

[26] *See also supra* fn. 12.

located in China, Fed. R. Civ. P. 4 governs service on Defendants in the instant matter.  While Defendants operate sophisticated commercial businesses offering for sale and/or selling Counterfeit Products to consumers in the U.S. – specifically including those in New York – such operations are limited to correspondence by email and communications otherwise transmitted over the Internet.  *See Arnaiz Dec.*, ¶¶ 6-11, *Ex.* A.  Therefore, Plaintiff respectfully submits that service through electronic methods is appropriate and necessary in the instant matter.

Pursuant to Fed. R. Civ. P (4)(1), service may be effected "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by The Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents" ("Hague Convention").  "Article 10 of The Hague Convention, allows for service of process through alternative means such as 'postal channels' and 'judicial officers,'" provided that the destination state does not object to those means."  *FTC v. PCCare247 Inc.*, No. 12-cv-7189-PAE, 2013 U.S. Dist. LEXIS 31969, at *10 (S.D.N.Y. Mar. 7, 2013) (citing Hague Convention, November 15, 1965, Article 10).  Here, the destination state is China, which, like the U.S., is a signatory to the Hague Convention.  Despite China's objection to service by postal channels under Article 10, this Court has held that such objection does not include service by email and further, that service by email is not prohibited by any international agreement.  *See Sulzer Mixpac AG v. Medenstar Indus. Co.*, 312 F.R.D. 329, 332 (S.D.N.Y. 2015) (concluding that "China's objection to service by postal mail does not cover service by email, and these forms of communication differ in relevant respects, such as email communications may be more reliable than long-distance postal communications, and the arrival of an email at its destination address may be more readily tracked.").[27]  Moreover,

---

[27] *See also, e.g.*, *F.T.C.*, 2013 U.S. Dist. LEXIS 31969 at *10 (authorizing service by email and Facebook to defendants in India, and stating that "[n]umerous courts have held that service by email does not violate any international agreement where the objections of the recipient nation are limited to those means enumerated in Article 10."); *Gurung v. Malhotra*, 279 F.R.D. 215, 219-20 (S.D.N.Y. 2011) (authorizing service by email to India despite India's objections

the Hague Convention specifies that it "shall not apply where the address of the person to be served with the document is not known." *See* Hague Convention, November 15, 1965, Article 1.

Plaintiff also may serve international defendants pursuant to Fed. R. Civ. P. 4(f)(3), which enables a court to grant an alternative method of service so long as it: "(1) is not prohibited by international agreement; and (2) comports with constitutional notions of due process." *SEC v. Anticevic*, 2009 U.S. Dist. LEXIS 11480, at *7 (S.D.N.Y. Feb. 8, 2009). Notably, "[s]ervice under subsection [4(f)] (3) is neither a last resort nor extraordinary relief. It is merely one means among several which enables service of process on an international defendant." *Sulzer Mixpac AG*, 312 F.R.D. 329, 330 (quoting *Advanced Aerofoil Techs., AG v. Todaro*, 2012 U.S. Dist. LEXIS 12383, at *1 (S.D.N.Y. Jan. 31, 2012) (internal citations omitted)). Since third-party merchants on Wish, like Defendants, have been known to use aliases, false addresses and other incomplete identification information to shield their true identities and there are, in fact, no physical addresses whatsoever associated with the majority of Defendants' User Accounts, this is exactly the circumstance where the courts should exercise, as they previously have exercised, the authority to grant alternative methods of service. *See id.* (quoting *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 115 (S.D.N.Y. 2010) ("The decision whether to allow alternative methods of serving process under Rule 4(f)(3) is committed to the sound discretion of the district court.") (internal quotation marks omitted)); *see also Wolgang Dec.*, ¶¶ 13-15.

Courts in this Circuit have routinely authorized service by electronic mail in a number of

---

to service through postal channels under Article 10 of the Hague Convention, and stating that "[w]here a signatory nation has objected to only those means of service listed in Article [10] [of the Hague Convention], a court acting under Rule 4(f) (3) remains free to order alternative means of service that are not specifically referenced in Article [10]."); *S.E.C. v. Anticevic*, 2009 U.S. Dist. LEXIS 11480, at *4 (S.D.N.Y. 2009) (authorizing service by publication and noting that "[n]either Germany nor Croatia explicitly objects to service by publication in their Declarations pursuant to the [Hague] Convention."); and *In re S. African Apartheid Litig.*, 643 F. Supp. 2d 423, 434 (S.D.N.Y. 2009) (permitting service on counsel in Germany and noting that "[a]lthough Germany has objected to specific forms of service otherwise enumerated in the Hague Convention, it has not expressly barred alternative forms of effective service not referenced in the Hague Convention.").

similar cases to the instant one, "where a defendant was . . . alleged to be an online China-based counterfeiting network linked to a functioning email address but which otherwise remained anonymous." *Dama S.P.A.*, 2015 U.S. Dist. LEXIS 178076, at *6-7; s*ee also AW Licensing, LLC*, 2015 U.S. Dist. LEXIS 177101, at *18-19 (by demonstrating that service by registered electronic mail would provide adequate notice to defendants, the Court ordered that the plaintiff may continue to serve process on defendants by email).  Similarly, courts have also authorized alternative methods of electronic service, such as service by Facebook messaging.[28]

In the instant matter, Plaintiff proposes using Outlook.com as well as RPost (www.rpost.com), an online service that confirms valid proof of authorship, content, and delivery of an email, as well as the official time and date that the email was sent and received.  *See Wolgang Dec.*, ¶ 26.  Other plaintiffs have used RPost in similar actions before this Court, which has allowed these plaintiffs to provide confirmation of delivery and receipt of service process on defendants by email.[29]  Thus, service by electronic means would serve the interests of justice and principles of fairness.

Along with service via email, Plaintiff respectfully requests that the Court, in its discretion, permit service via website publication.  Publication on a website has been deemed appropriate service under Fed. R. Civ. P (4)(3) "so long as the proposed publication is 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *National Association for Stock Car Auto Racing, Inc. v. Does*, 584 F. Supp. 2d 824, 826 (W.D.N.C. 2008) (quoting *Mullane v. Cent. Hanover Bank*

---

[28] *See*, *e.g. FTC v. PCCare247 Inc.*, 2013 U.S. Dist. LEXIS 31969, at *20 (S.D.N.Y. Mar. 7, 2013) (ordering service by Facebook messaging); *Lipenga v. Kambalame*, 2015 U.S. Dist. LEXIS 172778, at *9 (D. Md. Dec. 28, 2015) (finding service via Facebook and email appropriate under Rule 4(f)(3)).

[29] *See*, *e.g.*, *The National Football League v. Mono Lee d/b/a nflnfl.us*, No. 11-cv-8911-PKC (S.D.N.Y. Dec. 7, 2011); and *The National Football League v. Chen Cheng d/b/a nfljerseydiscount.com*, No. 11-cv-09944-WHP (S.D.N.Y. Jan. 19, 2011).

*& Trust Co*., 339 U.S. 306, 315-16 (1950)).  Here, Defendants have structured their businesses so that the sole means for customers to purchase Defendants' Counterfeit Products is by placing an order over the Internet.  *See Arnaiz Dec*., ¶¶ 6-11, *Ex*. A and *Wolgang Dec*., ¶¶ 3, 18.  The fact that Defendants' businesses are entirely Internet-based thereby demonstrates the reliability of website publication as an additional means of service.

Ultimately, service on Defendants by various electronic means — namely email by way of RPost or Outlook.com with a link to a secure website, such as Dropbox.com, NutStore.com and a large mail link created through RPost.com or via website publication through a specific page dedicated to this Lawsuit accessible through ipcounselorslawsuit.com — comports with due process, as it is "reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 309.  None of the Defendants have disclosed their mailing addresses.  *See Wolgang Dec*., ¶¶ 24-25.  Due to Defendants' purposeful anonymity, service by email and website publication is most likely to provide Defendants with proper notice of this action and Plaintiff's claims.  *See Dama S.P.A.*, 2015 U.S. Dist. LEXIS 178076, at *7 (finding where service by email or other electronic means will provide adequate notice under Rule 4(f), such service is warranted and should be granted).[30]  Therefore, Plaintiff respectfully submits that an order allowing service of process via email and website publication will benefit all parties and the Court by ensuring that Defendants receive immediate notice of the pendency of this action and allowing this action to move forward expeditiously.

Plaintiff also respectfully submits that the Court issue an order authorizing Plaintiff to serve the Financial Institutions and/or Third Party Service Providers with notice of the Court's order of

---

[30] *See supra* fn. 12.

the Application via electronic means prior to serving Defendants and with enough time for the

Financial Institutions and/or Third Party Service Providers to comply with the Court's order.

### E.     PLAINTIFF IS ENTITLED TO AN ORDER AUTHORIZING EXPEDITED DISCOVERY

Additionally, Plaintiff respectfully requests that the Court order expedited discovery from

Defendants, Financial Institutions and Third Party Service Providers regarding the scope and

extent of Defendants' counterfeiting and infringing activities, as well as Defendants' account

details and other information relating to Defendants' Financial Accounts, Assets and/or any and

all User Accounts and or Financial Accounts with the Third Party Service Providers, including,

without limitation any and all websites, any and all accounts with online marketplace platforms

such as Wish, as well as any and all as yet undiscovered accounts with additional online

marketplace platforms held by or associated with Defendants, their respective officers, employees,

agents, servants and all other persons in active concert with any of them ("User Accounts"), and

any and all User Accounts through which Defendants, their respective officers, employees, agents,

servants and all persons in active concert or participation with any of them operate storefronts to

manufacture, import, export, advertise, market, promote, distribute, display, offer for sale, sell

and/or otherwise deal in products, including Counterfeit Products, which are held by or associated

with Defendants, their respective officers, employees, agents, servants and all persons in active

concert or participation with any of them ("Merchant Storefront(s)") including, without limitation,

those owned and operated, directly or indirectly, by the Third Party Service Providers and the

Financial Institutions.

Generally, a party may not seek discovery prior to a Rule 26(f) conference unless authorized

by a court order.  *See* Fed. R. Civ. P. 26(d)(1).  While in the past, Courts in this District have often

applied a four-factor test to determine when expedited discovery may be granted,[31] they now apply a more flexible "good cause" test to examine "the discovery request . . . on the entirety of the record to date and the *reasonableness* of the request in light of all the surrounding circumstances." *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 326 (S.D.N.Y. 2005) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor,* 194 F.R.D. 618, 624 (N.D. Ill. 2000)).[32]   Regardless of which test is applied, Plaintiff has established that it is entitled to the expedited discovery requested.   Plaintiff has demonstrated both irreparable injury and their probability of success on the merits above, and taking into account the covert nature of Defendants, their business operations and the fact that they are foreign individuals or companies who have both the incentive and the capability to hide or destroy relevant business records and other discoverable information and documentation upon hearing of this action, Plaintiff respectfully submits that there is good cause for this Court to grant Plaintiff the expedited discovery requested herein because it will prevent further injury to Plaintiff and assist Plaintiff in pursuing its claims against Defendants and in recovering the damages to which it is entitled.   *See Ayyash*, 233 F.R.D., at 327; *see also Lombardo Dec.*, ¶ 25 and *Wolgang Dec.*, ¶¶ 11-15, 24-25.

Despite the likelihood of success of Plaintiff's claims and the injury it has and continues to endure, if this Court were to deny expedited discovery, Plaintiff may lose the opportunity to

---

[31] ". . . the plaintiff must demonstrate (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." *Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd.*, 1994 U.S. Dist. LEXIS 18457, at *7 (S.D.N.Y. Dec. 28, 1994).

[32] *See*, *e.g.*, *Malibu Media, LLC v. Doe*, 2016 U.S. Dist. LEXIS 64656, at *4 (S.D.N.Y. May 16, 2016); *Malibu Media, LLC v. Doe*, 2015 U.S. Dist. LEXIS 87751, at *2-3 (S.D.N.Y. July 6, 2015); *Milk Studios, LLC v. Samsung Elecs. Co.*, 2015 U.S. Dist. LEXIS 38710, at *4-5 (S.D.N.Y. Mar. 25, 2015); *Admarketplace, Inc. v. Tee Support, Inc.*, No., 2013 U.S. Dist. LEXIS 129749, at *3-4 (S.D.N.Y. Sept. 11, 2013); *Dig. Sin, Inc. v. Does 1-176*, 279 F.R.D. 239, 241 (S.D.N.Y. 2012); and *Stern v. Cosby*, 246 F.R.D. 453, 457 (S.D.N.Y. 2007) (agreeing with the *Ayyash* Court that the more flexible approach is the better approach.).

effectively pursue its claims against Defendants because there are several aspects of Defendants' counterfeiting and infringing activities that Plaintiff is not yet able to confirm, including: 1) the true identities of Defendants, 2) the full scope of Defendants' counterfeiting and infringing activities, 3) the source or location of Defendants' inventory of Counterfeit Products and/or 4) where the proceeds from Defendants' counterfeiting and infringing activities have gone. *See Wolgang Dec.*, ¶¶ 11-15, 24-25; *see also Admarketplace, Inc. v. Tee Support, Inc.*, No. 13-cv-5635-LGS, 2013 U.S. Dist. LEXIS 129749, at *5 (S.D.N.Y. Sep. 11, 2013) (finding that a plaintiff "who has a potentially meritorious claim and no ability to enforce it absent expedited discovery, has demonstrated good cause for expedited discovery"). Therefore, only through an order from the Court allowing expedited discovery will Plaintiff be able to fully ascertain the extent of Defendants' counterfeiting and infringing activities.

Plaintiff respectfully requests an *ex parte* Order allowing expedited discovery in order to permit them to discover certain identifying information, including information concerning all of Defendants' Financial Accounts, Assets and User Accounts and their sales of Counterfeit Products. The discovery requested on an expedited basis in Plaintiff's [Proposed] Order has been limited to include only that which is essential to prevent further irreparable harm. Under Fed. R. Civ. P. 65(d)(2)(C), this Court has the power to bind any third parties who are in active concert with Defendants that are given notice of the Order to provide expedited discovery. Moreover, Financial Institutions and Third Party Service Providers have complied with similar requests for expedited discovery in like actions before this Court. *See supra* note 12. Plaintiff respectfully submits that its request should be granted.

## F.   PLAINTIFF'S REQUEST FOR A SECURITY BOND IN THE AMOUNT OF $5,000 IS ADEQUATE

Plaintiff respectfully submit that in connection with the Court's order pursuant to its

inherent equitable power requiring that the Defendants' Assets and Defendants Financial Accounts be frozen by the Financial Institutions and/or Third Party Service Providers, Plaintiff's provision of security in the amount of $5,000 ("Security Bond") is more than sufficient.  This Security Bond is equal to an amount that similar plaintiffs have posted in related cases before the Court.  *See Rovio Entertainment Ltd. and Rovio Animation OY v. Best Baby and Kid Store, et al.*, No. 17-cv-4884-KPF, Dkt. 6 (S.D.N.Y. June 28, 2017); *Rovio Entertainment Ltd. and Rovio Animation OY v. Angel Baby Factory d/b/a Angelbaby_factory et al.*, No. 17-cv-1840-KPF, Dkt. 11 (S.D.N.Y. March 27, 2017).  Moreover, this Court has gone as far as to hold that no security bond is necessary in similar circumstances.  *See, e.g.*, *Ontel Products Corp. v. Airbrushpainting Makeup Store a/k/a Airbrushespainting, et al.*, No. 17-cv-871-KBF, Dkt. 20 (S.D.N.Y. Feb. 6, 2017).

The Second Circuit has held that "[d]istrict courts … are vested with wide discretion in determining the amount of the bond that the moving party must post."  *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).  Typically, "the amount of the bond posted is the limit that a wrongfully restrained party may recover," but the Court must also balance this against a likelihood of harm the non-movant would be able to show.  *Interlink Int'l Fin. Servs., Inc. v. Block*, 145 F. Supp. 2d 312, 314 (S.D.N.Y. 2001); *see also Doctor's Assocs.*, 85 F.3d at 985.  Plaintiff believes that Defendants would be unable to show a strong likelihood of harm, and even if Defendants were to experience a likelihood of harm, such harm is outweighed by the harm Plaintiff, as detailed above.  For these reasons, Plaintiff respectfully requests that the Court, in accordance with Fed. R. Civ. P. 65(a), enter the Security Bond in the amount of $5,000.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff respectfully requests that its Application be granted *ex parte* and that the Court enter: 1) a temporary restraining order; 2) an order restraining assets and

Merchant Storefronts; 3) an order to show cause why a preliminary injunction should not issue; 4) an order authorizing alternative service and 5) an order authorizing expedited discovery against Defendants, Third Party Service Providers and Financial Institutions in the form of the [Proposed] Order accompanying this Application, and such other relief to which Plaintiff may show it is legally entitled.

Dated:  March 21, 2018

Respectfully submitted,

EPSTEIN DRANGEL LLP

BY: _____

Spencer J. Wolgang (SW 2389)
swolgang@ipcounselors.com
Mary Kate Brennan (MB 5595)
mbrennan@ipcounselors.com
Jason M. Drangel (JD 7204)
jdrangel@ipcounselors.com
Ashly E. Sands (AS 7715)
asands@ipcounselors.com
EPSTEIN DRANGEL LLP
60 East 42nd Street, Suite 2520
New York, NY 10165
Telephone: (212) 292-5390
Facsimile: (212) 292-5391
*Attorneys for Plaintiff*
*Ideavillage Products Corp.*